291 F.Supp.2d 269 (2003)
FORUM FOR ACADEMIC AND INSTITUTIONAL RIGHTS, INC., a New Jersey membership corporation, Society of American Law Teachers, Inc., a New York corporation, et al., Plaintiffs,
v.
Donald H. RUMSFELD, in his capacity as U.S. Secretary of Defense, et al., Defendants.
Civil Action No. 03-4433 (JCL).
United States District Court, D. New Jersey.
November 5, 2003.
*270 *271 *272 *273 *274 Andrew Dwyer, Esq., Dwyer & Dunnigan, LLC, Newark, NJ, E. Joshua Rosenkranz, Esq., Timothy P. Wei, Esq., Sharon E. Frase, Esq., Heller Ehrman White & McAuliffe, LLP, New York, NY, for Plaintiffs.
Peter D. Keisler, Esq., Assistant Attorney General, Christopher J. Christie, United States Attorney, Vincent M. Garvey, Esq., Deputy Branch Director, Michael A. Chagares, Esq., Chief, Civil Division, Assistant United States Attorney, Mark T. Quinlivan, Esq., Senior Trial Counsel, U.S. Department of Justice, Washington, DC, for Defendants.

OPINION
LIFLAND, District Judge.
Plaintiffs Forum for Academic and Institutional Rights, Inc. ("FAIR"), Society of American Law Teachers, Inc. ("SALT"), The Coalition for Equality ("CFE"), Rutgers Gay and Lesbian Caucus ("RGLC"), law professors Erwin Chemerinsky and Sylvia Law (collectively, "Law Professors"), and law students Pam Nickisher, Leslie Fischer, Ph.D., and Michael Blauschild (collectively, "Law Students") seek a preliminary injunction enjoining enforcement of the so-called Solomon Amendment â a statute conferring authority on the United States Secretary of Defense to deny federal funding to institutions of higher education that prohibit or effectively prevent on-campus military recruiting. Plaintiffs contend that the Solomon Amendment is unconstitutional because it (1) conditions a benefit â federal funding â on the surrendering of law schools' First Amendment rights of academic freedom, free speech, and freedom of expressive association; (2) discriminates on the basis of viewpoint by promoting only a pro-military recruiting message and by punishing *275 only those schools that exclude the military because they find the military's policy against homosexual conduct morally objectionable; and (3) violates the void-for-vagueness doctrine for lack of clear guidelines and for conferring unbridled discretion on military bureaucrats to decide which institutions to target and what acts or omissions amount to non-compliance with the statute. Defendants (collectively, "the Government") move to strike or, in the alternative, to dismiss Plaintiffs' Second Amended Complaint for lack of standing, and otherwise oppose the Motion for a Preliminary Injunction on the basis that the Solomon Amendment is a valid exercise of the Spending Clause that conditions federal funding on conduct unrelated to speech.
As discussed more fully herein, the Government's Motion to Strike will be denied because Plaintiffs obtained express leave of Court to file a Second Amended Complaint. The Government's Motion to Dismiss Plaintiffs' Second Amended Complaint for Lack of Standing will be denied on the basis that the factual allegations are sufficient to confer standing on all associational and individual plaintiffs.
Finally, Plaintiffs' Motion for a Preliminary Injunction will be denied on the basis that Plaintiffs have not established a likelihood of success on the merits of their constitutional challenges to the Solomon Amendment. As with all constitutional challenges to legislation, the question is not whether the Court believes that the legislation is wise or unwise, or even fair or unfair. Those are value judgments which can and do vary from time to time, from person to person, and from issue to issue. The question is whether Congress, a co-equal branch of our government, has overstepped the boundaries prescribed, albeit in general terms, by our Constitution. Those boundaries have been made clearer by centuries of experience with case-by-case development of constitutional doctrines. Application of those doctrines, as explained in the cases cited, to the facts of this case, has led the Court to the conclusion that the compulsion exerted by the Solomon Amendment, as an exercise of Congress' spending power and its power and obligation to raise military forces, on balance, is not violative of the First Amendment rights of free speech, expressive association, and academic freedom where that compulsion operates primarily to compel or limit conduct, not speech or expression, and where, to the extent speech or expression is diluted, it can be readily and freely reconstituted, thus preserving the message for propagation by all who wish to express it and to all who may hear it.

PARTIES
Plaintiff FAIR, an association of law schools and law faculties, is a membership corporation organized under the laws of the State of New Jersey. Membership is open to law schools, other academic institutions, and faculties that vote by a majority to join. FAIR's stated mission is "to promote academic freedom, support educational institutions in opposing discrimination and vindicate the rights of institutions of higher education." (Second Amended Complaint ś 7(a) [hereinafter "Am. Compl."]). With few exceptions, FAIR membership is kept secret. (Am. Compl.ś 7(d)).
Plaintiff SALT is a New York corporation with nearly 900 law faculty members committed "to making the legal profession more inclusive and to extending the power of the law to underserved individuals and communities." (Am.Compl.ś 8). Plaintiff Erwin Chemerinsky is the Sydney M. Irmas Professor of Public Interest Law, Legal Ethics and Political Science at the *276 University of Southern California Law School ("USC Law"), and Plaintiff Sylvia Law is the Elizabeth K. Dollard Professor of Law, Medicine and Psychiatry at New York University Law School ("NYU Law"). Plaintiffs CFE, of Boston College Law School, and RGLC, of Rutgers University School of Law, (collectively, "Law Student Associations") are student organizations committed "to furthering the rights and interests of all groups including gays and lesbians." (Am.Compl.ś 9). Plaintiffs Pam Nickisher, Leslie Fischer, Ph.D., and Michael Blauschild are students at Rutgers University School of Law.
Defendant Donald Rumsfeld heads the Department of Defense ("DOD") in his capacity as the United States Secretary of Defense. The DOD is charged with implementing the Solomon Amendment and making the ultimate determination as to whether an institution is in compliance therewith. Defendant Rod Paige heads the Department of Education in his capacity as the United States Secretary of Education. Defendant Elaine Chao heads the Department of Labor in her capacity as the United States Secretary of Labor. Defendant Tommy Thompson heads the Department of Health and Human Services in his capacity as the United States Secretary of Health and Human Services. Defendant Norman Mineta heads the Department of Transportation in his capacity as the United States Secretary of Transportation. Defendant Tom Ridge heads the Department of Homeland Security as the United States Secretary of Homeland Security. The Departments collectively make available billions of dollars in the form of grants and federal contracts each year to institutions of higher education covered by the Solomon Amendment.

PROCEDURAL HISTORY
On Friday, September 19, 2003, Plaintiffs sought a temporary restraining order ("TRO") and preliminary injunction enjoining enforcement of the Solomon Amendment. The Court denied Plaintiffs' request for a TRO at a hearing held the same day. At the hearing, the Assistant United States Attorney informed the Court of a Government shut down in the District of Columbia due to Hurricane Isabel. Given the Government's inability to respond to Plaintiffs' voluminous submissions â including an over-length brief and a three-inch thick bound volume of eighteen declarations â the Court set a briefing schedule.
The Government timely submitted a Motion to Dismiss for Lack of Standing and Opposition to Plaintiffs' Motion for a Preliminary Injunction on Friday, September 26, 2003. Plaintiffs submitted a reply brief on Monday, September 29, 2003. During a telephone conference held later that day, the Court granted Plaintiffs' request to respond more fully to the Government's Motion to Dismiss and ordered both parties to further brief the impact on standing, if any, of FAIR's secret membership list.
The Court heard oral argument on Friday, October 10, 2003. At argument, counsel for Plaintiffs advised the Court that a First Amended Complaint had been filed earlier that morning. Counsel also indicated that he was prepared to file a Second Amended Complaint based on new information that a law school member of FAIR was willing to be publicly identified. The Court indicated that it would accept and direct the Clerk to file the Second Amended Complaint, subject to its verification. On October 15, 2003, Plaintiffs filed a Second Amended Complaint identifying two members of FAIR â Golden Gate University School of Law and the Faculty of Whittier Law School. (Am. Compl.ś 7(d)). By letters dated October *277 15 and 17, 2003, Plaintiffs informed the Court that NYU Law and the Faculty of Chicago-Kent University School of Law had also agreed to be publicly identified as members of FAIR.
On October 22, 2003, the Government moved to strike or, in the alternative, to dismiss Plaintiffs' Second Amended Complaint for lack of standing. Plaintiffs submitted a responsive brief the following day.

BACKGROUND AND FACTS
The facts are drawn largely from Plaintiffs' Second Amended Complaint and declarations submitted in connection with Plaintiffs' Motion for a Preliminary Injunction. At this juncture, the Government has not challenged or substantially supplemented Plaintiffs' factual assertions.

Solomon Amendment
The Solomon Amendment, in pertinent part, reads as follows:
(b) Denial of funds for preventing military recruiting on campus. â No funds described in subsection (d)(2) may be provided by contract or by grant (including a grant of funds to be available for student aid) to an institution of higher education (including any subelement of such institution) if the Secretary of Defense determines that that institution (or any subelement of that institution) has a policy or practice (regardless of when implemented) that either prohibits, or in effect prevents â 
(1) the Secretary of a military department or Secretary of Transportation from gaining entry to campuses, or access to students ... on campuses, for purposes of military recruiting; or
(2) access by military recruiters for purposes of military recruiting to ... information pertaining to students ... enrolled at that institution (or any subelement of that institution).
10 U.S.C. § 983(b) (2003). Subsection (d)(2) identifies funds made available for the Departments of Defense and Transportation, as well as those in a Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act. Id. § 983(d)(2). The Solomon Amendment also applies to funds from the Department of Homeland Security. Pub.L. No. 107-296, Title XVII, §§ 1704(b)(1),(g), 116 Stat. 2314, 2316 (2002).
A subelement of an institution is defined as "a discrete (although not necessarily autonomous) organizational entity that may establish policies or practices affecting military recruiting and related actions." 32 C.F.R. § 216.3(d). A law school is an example of a subelement. Id. Current DOD regulations provide that limitations on DOD funding apply to an offending subelement as well as its parent institution, whereas limitations on other federal funding apply only to the offending subelement. 32 C.F.R. § 216.3(b)(1) (stating that "limitations on the use of funds ... shall apply only to the subelement and not to the parent institution as a whole"); 65 Fed.Reg. 2056 (Jan. 13, 2000) (prohibiting DOD from providing funds to institution of higher education and any subelement of same upon a determination that institution or any subelement prohibits or in effect prevents military recruiting on campus). Schools deemed ineligible for federal funding pursuant to the Solomon Amendment are identified in the Federal Register at least once every six months. 32 C.F.R. § 216.5(a)(4).
Not every school that denies the military recruiters access to its campus or to its students risks losing federal funding. The Solomon Amendment and the DOD regulations promulgated thereunder carve *278 out various exceptions. The statute exempts schools that (1) have ceased an offending policy or practice or (2) have a longstanding, religious-based policy of pacifism. 10 U.S.C. § 983(c). The DOD regulations exempt schools that bar all employers from on-campus recruiting, and those able to demonstrate that "the degree of access by military recruiters is at least equal in quality and scope to that afforded to other employers." 32 C.F.R. § 216.4(c)(3). Also exempted are schools at which student interest does not justify accommodating military recruiters. Id. § 216.4(c)(6)(ii). There are also exemptions pertaining to the requirement in Section 983(b)(2) that schools provide the military with student recruiting information. 32 C.F.R. § 216.4(c)(4)-(5).[1]

History of the Solomon Amendment
A policy of discouraging barriers to on-campus military recruitment pre-dates the 1994 passage of the Solomon Amendment by nearly thirty years. United States v. City of Philadelphia, 798 F.2d 81, 86 (3d Cir.1986). Congress enacted legislation in the 1960s and 1970s that, much like the Solomon Amendment, authorized the withholding of defense funds from schools that maintained a policy barring military recruiters or otherwise eliminated the Reserve Officers Training Corps program. Id. (citing Department of Defense Authorization Act of 1973, Pub.L. No. 92-436, § 606(a), 86 Stat. 734, 740 (1972) [hereinafter "the DDA of 1973"]; Department of Defense Authorization Act of 1971, Pub.L. No. 91-441, § 510, 84 Stat. 905 (1970); National Aeronautics and Space Administration Authorization Act of 1969, Pub.L. No. 90-373, § 1(h), 82 Stat. 280, 281-82 (1968); 118 Cong. Rec. 22,346 (1972)). Section 606(a) of the DDA of 1973, for example, provided that
[n]o part of the funds appropriated pursuant to this or any other Act for the Department of Defense or any of the Armed Forces may be used at any institution of higher learning if the Secretary of Defense or his designee determines that recruiting personnel of any of the Armed Forces of the United States are being barred by the policy of such institution from the premises of the institution. ...
DDA of 1973, Pub.L. No. 92-436, § 606(a), 86 Stat. 734, 740 (1972).
The apparent impetus for the Solomon Amendment was the continued refusal of many educational institutions to allow the military to engage in on-campus recruiting.[2] The original version of the statute *279 denied federal funding "to any institution of higher education that has a policy of denying, or which effectively prevents, the Secretary of Defense from obtaining for military recruiting purposes (A) entry to campuses or access to students on campuses; or (B) access to directory information pertaining to students." National Defense Authorization Act of 1995, Pub.L. No. 103-337, § 558, 108 Stat. 2663 (1994). Targeted funds included only those administered by the DOD and only those flowing to the particular school, or subelement, that declined to allow the military to recruit on campus. Id.; 61 Fed.Reg. 7739 (Feb. 29, 1996). Thus, for example, a law school that did not permit on-campus military recruiting risked only DOD funds allocated for the law school itself, and not funds flowing to its parent university.
As of 1997, the Solomon Amendment more broadly provided that any "covered education entity" that prevented access by military recruiters to campuses, students, or student information risked not only DOD funding, but all funds available from the Departments of Labor, Health and Human Services, Education, and any related agency. Targeted funding also included "any grant of funds to be available for student aid." Omnibus Consolidated Appropriations Act of 1997, Pub.L. No. 104-208, § 514(b), 110 Stat. 3009-270 (1996) (formerly 10 U.S.C. § 503), repealed by Pub.L. No. 106-65, 113 Stat. 512 (1999). The DOD continued to interpret the statute to mean that only a school's subelement that violated the Solomon Amendment risked losing federal funding. 63 Fed.Reg. 56,819 (stating that non-compliance of "only a subelement of a parent institution" implicated funding "only to the subelement and not to the parent institution as a whole").
In January 1998, the Department of Education ("DOE") clarified the effect of the Solomon Amendment on programs of student financial assistance under Title IV of the Higher Education Act of 1965, as amended. 63 Fed.Reg. 56,821 (Oct. 23, 1998). The DOE explained that the Solomon Amendment applied only to "campus based" student aid programs for which the educational institutions (not the students) applied and were awarded funding. Such programs included the Federal Perkins Loan, the Federal Work-Study, and the Federal Supplemental Education Opportunity Grant programs. Id. Direct student aid programs â funds made directly available to students (e.g., Federal Pell Grant, the Federal Family Education Loan, and the Federal Direct Loan programs) â remained outside the scope of the statute. In 1999, the Frank-Campbell Amendment expressly removed from the scope of the Solomon Amendment "any Federal grant of funds to an institution of higher education to be available solely for student financial assistance or related administrative costs." Department of Defense Appropriations Act of 2000, § 8120, Pub.L. No. 106-79, 113 Stat. 1260 (1999).
In 2000, the DOD amended its regulations to eliminate the subelement limitation as to DOD funds. 65 Fed.Reg. 2056 (Jan. 13, 2000). The subelement limitation remained in effect as to funds from other federal agencies. See 32 C.F.R. § 216. Thus, a non-compliant law school risked DOD funds flowing to both the law school *280 and its parent university, as well as other federal funding flowing to the law school (but not to the parent institution).

Law School Non-Discrimination Policies
Law schools have determined that diversity among their faculty and students is essential to their core mission of "train[ing] the next generation of leaders to pursue justice, respect the rule of law, and stand by principle." (Am. Compl.śś 19-21) ("[L]aw schools have promoted, demanded, and strictly enforced, not merely diversity, but also tolerance and respect."). Nearly every accredited American law school has adopted policies against discrimination on the basis of categories such as national origin, religion, gender, race, ethnicity, marital status, parental status, veteran status, physical disability, age, and sexual orientation. (Am. Compl.śś 21-22). Law schools admit students, award scholarships, hire and promote faculty, and hire staff consistent with their non-discrimination policies. (Am. Compl.ś 23). A typical law school nondiscrimination policy states:
[The Law School] is committed to a policy against discrimination based upon age, color, handicap or disability, ethnic or national origin, race, religion, religious creed, gender (including discrimination taking the form of sexual harassment), marital, parental or veteran status, or sexual orientation.
(Am.Compl.ś 22). The trend of including sexual orientation as a protected category in non-discrimination policies began in the late 1970s. NYU Law was the first school to do so, and others followed its lead. (Rosenkranz Decl. ś 10).
As corollaries to their non-discrimination policies, law schools adhere to recruiting policies whereby they refuse to offer school resources, support, or endorsement to any employer that discriminates based on protected categories. (Am.Compl.ś 23). The recruitment policies are applied evenhandedly to all employers. (Am. Compl.ś 26). The policies, in the law schools' judgment, serve both pedagogical and instrumental purposes by teaching values students would not otherwise learn from case books and by fostering an environment of free and open discourse. (Am. Compl.śś 24-25). The policies neither prevent discriminating employers from contacting students, nor steer students away from such employers. While students remain free to seek jobs with employers that discriminate, including the military, they must do so without school support or resources. (Am.Compl.ś 26).

The AALS Position
The Association of American Law Schools ("AALS") is a non-profit association of law schools committed to improving the legal profession through legal education. It functions "as the learned society for law teachers and is legal education's principal representative to the federal government and to other national higher education organizations and learned societies." American Association of Law Schools, What is the AALS? at http://www.aals.org/about.html. In 1990, the AALS voted to include sexual orientation as a protected category in law school non-discrimination policies. (Rosenkranz Decl. ś 10). Accordingly, all of the more than 160 member law schools of the AALS extended their non-discrimination policies to cover sexual orientation. (Id.).
Section 6-4 of the By-Laws of the AALS requires member schools to, among other things, provide "students and graduates with equal opportunity to obtain employment, without discrimination or segregation" on the basis of sexual orientation and other protected categories. (Rosenkranz Decl. ś 10, Ex. 1). Schools must communicate to employers their "firm expectation" *281 that the employers will observe the principle of equal opportunity. (Id.). Employers seeking to utilize member law school career services must provide written assurance that they will not discriminate on the basis of protected categories; the schools refuse to assist any employer that declines to so certify. (Rosenkranz Decl. ś 7).
The AALS has recognized the tension between its By-Laws requiring non-discrimination and the Solomon Amendment: "[T]he Amendment ... places most law schools in the difficult position of either foregoing financial aid funds that are critical to their students or receiving the financial aid funds but failing to provide an environment that adequately protects its students from the experience of discrimination." (Rosenkranz Decl. ś 10, Ex. 3). In apparent resolution of that tension, the AALS has suggested "ameliorative" measures to be taken by law schools that choose to permit on-campus military recruiting so that those schools may be deemed compliant with the By-Laws:
[E]ach school should assure that all its students, as well as others in the law school community, are informed each year that the military discriminates on a basis not permitted by the school's nondiscrimination rules and the AALS by-laws and that the military is being permitted to interview only because of the loss of funds that would otherwise be imposed under the Solomon Amendment (or, in appropriate cases, because of higher university directives that compel the law school to permit access). Other ameliorative acts that schools might consider include forums or panels for the discussion of the military policy or for the discussion of discrimination based on sexual orientation. Although no specific type of amelioration is required, the Executive Committee will examine the actions schools take in the context of the totality of the school's efforts to support [a] hospitable environment for its students. In assessing that environment, the Association will consider, among other things, the presence of an active lesbian and gay student organization and the presence of openly lesbian and gay faculty and staff.
(Id.).

Law School Compliance with the Solomon Amendment
Law schools are loathe to endorse or assist recruiting efforts of the United States military because of its policy against homosexual activity.[3] Law school *282 administration, faculty, and students have openly expressed their disapproval with the military's policy in a variety of ways. Some law schools, for example, have posted ameliorative statements throughout the school advising that the military does not comply with the school's non-discrimination policies. (Appleton Decl. ś 18, Ex. 9; Law Decl. ś 22). Law faculty and student bar resolutions also have condemned the military's policy and, correspondingly, expressed support of non-discrimination policies. (Appleton Decl. śś 14, 16; Law Decl. śś 22-23). In addition, students and faculty have held demonstrations protesting on-campus military recruiting. (Appleton Decl. ś 19; Gerken Decl. śś 24-28; Law Decl. ś 35, Smolik Decl. ś 2; Sweeney Decl. ś 11).
Law schools have attempted to comply with the Solomon Amendment, notwithstanding the military's discriminatory policy. While some law schools denied military access to campus, others developed ways to adhere to their respective nondiscrimination policies and still permit the military access to interested students. (Am.Compl.śś 7(j),(k)). Some law schools permitted the military to recruit on campus, but refused to schedule student interviews. (Id. ś 7(k)). Other law schools allowed military recruiters to use university facilities, but not law school facilities. (Id.). Many refused to let military recruiters participate in school-sponsored job fairs. (Id.). Still other schools refused to match students with recruiters or post military literature. (Id. ś 34). One law school, for example, allowed military recruiters on campus, but kept military recruiting literature separate from its career services office and arranged interviews through the dean's office. (Rosenkranz Decl. ś 19).
On occasion, the military has expressed satisfaction with the law schools' efforts to accommodate military recruiters. For instance, a 1998 letter from the Department of the Army thanked USC Law's career services office "for providing ... military recruiters a degree of access to students that is equal in quality and scope to that afforded other employers, consistent with the regulations...." (Chemerinsky Decl. ś 19). Another 1998 letter from the Department of the Army thanked NYU Law for its efforts in notifying students about a military recruiter's scheduled trip to the New York area. (Law Decl. ś 16; Ex. 6). That same letter signaled an abundance of recruits, stating that "[c]ompetition has become very keen in the past few years for ... JAG attorney positions" and that, as a result, "some very qualified applicants will not be selected for a position." (Id.).
However, in or about 2001, the military began to express dissatisfaction with the law schools. The DOD and officers of various branches of the military notified various schools that they were not in compliance with the Solomon Amendment. Plaintiffs have submitted detailed declarations recounting Solomon Amendment stories from at least nine different law schools. In general, Plaintiffs allege that the DOD threatened law schools with the loss of not only DOD funding, but all federal funding, if the schools did not afford the military full access to career services, the students, and the law schools. (Am. Compl. ś 36; Chemerinsky Decl. ś 21; Gerken Decl. ś 16). Plaintiffs further allege that, despite written requests from various law schools, the DOD failed to *283 offer specific guidance as to what the military requires of the law schools in order to be deemed compliant with the Solomon Amendment (Am. Compl. ś 37; Rosenkranz Decl. ś 22; Eskridge Decl. śś 39-55), and replied simply by way of notification that the schools remained in default (Am.Compl.śś 7(m), 37).
Solomon Amendment stories from Yale Law School and USC Law[4] are illustrative of the DOD's current stance. Yale Law School consistently permitted military recruiters on campus to meet students in response to expressed student interest, and provided military recruiters access to student directory information. (Eskridge Decl. śś 37, 40). But the school-sponsored off-campus interview programs were only open to employers that complied with the school's non-discrimination policy. (Eskridge Decl. ś 40). By letter dated May 29, 2002, United States Army Colonel Tate notified Yale that the Law School was non-compliant with the Solomon Amendment insofar as it (1) maintained a policy that limited military recruiting; (2) did not provide the military access to law school-sponsored interviewing programs; and (3) did not permit the military to recruit on campus unless invited on by a law student or law student organization. (Eskridge Decl. ś 41, Ex. 10). The letter threatened funding denial unless, by July 1, 2002, the Army received information that the law school had modified its policies to conform to federal requirements. (Id.). By letter dated May 29, 2003, Acting Deputy Under Secretary of Defense William Carr notified Yale that allowing military recruiters to use law school facilities, but not the career development office, violated the Solomon Amendment because the DOD had interpreted the statute "to require universities to provide military recruiters access to students equal in quality and scope to that provided to other recruiters." (Eskridge Decl. ś 55; Ex. 18). According to Mr. Carr, not allowing the military access to the law school's career development services would "impose substantial burdens and restrictions ... to schedule interviews with students through e-mail or other means, rather than through the standard processes provided ... to other employers." (Id.).
USC Law encountered a similar situation. By letter dated December 17, 2001, United States Air Force Colonel Daniel B. Fincher wrote to the President of USC requesting clarification of the Law School's policies concerning military recruitment. USC's General Counsel responded by explaining the school's policy exception for military recruiters. (Eskridge Decl. ś 20; Ex. 6). Under the policy exception, the law school (1) provided military recruiters with standard employer information and materials; (2) referred the military recruiter to on-campus ROTC offices for scheduling of interview space; (3) posted a notice in the school's weekly career services newsletter indicating the scheduled recruiter visit; (4) provided students with information about how to apply for an interview with the military; and (5) made available military recruitment materials to all students. On May 30, 2002, Colonel Fincher notified USC that the Law School's policy did not conform to the Solomon Amendment and to do so USC must "allow[ ] the military full access to the services of the Career Services Office, the students, and the law school." (Chemerinsky Decl. śś 20-21).

Recruitment Seasons
Most law schools host employers in the fall and spring. (Am Compl. ś 41). At the close of fall recruiting season, law school *284 career services personnel begin collecting and disseminating literature, making arrangements, and organizing appointments for employers who will be arriving in the spring. (Id.). The same is true for spring recruitment season. Thus, preparation for upcoming recruitment seasons occurs year round. (Id.). As of the fall 2003 recruiting season, every law school in the nation that receives federal funds has suspended permanently their non-discrimination policies as applied to military recruiters. (Am.Compl.ś 40).

THE GOVERNMENT'S MOTION TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT
The Government moves to strike Plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a), which states that a party may amend a pleading once as a matter of right and thereafter "only by leave of court or by written consent of the adverse party." The Government contends that Plaintiffs failed to obtain express leave of court or written consent to file the Second Amended Complaint. To the contrary, the Court granted Plaintiffs leave to file the Second Amended Complaint at oral argument. (Tr. at 68:5-8) ("I will accept and direct the clerk to file your [Second] amended complaint...."). The Motion to Strike Plaintiffs' Second Amended Complaint will be denied.

THE GOVERNMENT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT FOR LACK OF STANDING[5]

I. Standard of Review
A party may challenge the court's jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), either by attacking the allegations on the face of the complaint, or the facts supporting the allegations. Carpet Group Int'l v. Oriental Rug Imp. Ass'n, 227 F.3d 62, 69 (3d Cir.2000); Mortensen v. First Fed. Savings & Loan Ass'n, 549 F.2d 884, 891 (3d Cir.1977). Where, as here, a party challenges the court's subject matter jurisdiction on the pleadings, the court "must assume that the allegations contained in the complaint are true." Cardio-Med. Assocs. Ltd. v. Crozer-Chester Med. Ctr., 721 F.2d 68, 75 (3d Cir.1983). The court's evaluation is thus similar to the analysis used in evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Mortensen, 549 F.2d at 891; Cohen v. Kurtzman, 45 F.Supp.2d 423, 428 (D.N.J.1999).

II. Analysis
Article III, § 2 of the United States Constitution "extends the `judicial Power' of the United States only to `Cases' and `Controversies.'" Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Standing is "an essential and unchanging part of the case-or-controversy requirement." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To satisfy the "case or controversy" requirement for standing a plaintiff must demonstrate that it has suffered (1) an injury-in-fact (2) caused by the conduct complained of, and (3) that such injury is likely to be redressed by a favorable judicial decision. Id.; Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d *285 278, 283 (3d Cir.2002). An injury-in-fact is defined as "an invasion of a legally protected interest which is (a) concrete and particularized and (b) `actual or imminent, not conjectural and hypothetical.'" Lujan, 504 U.S. at 560, 112 S.Ct. 2130 (citations and internal quotations omitted). The causal connection required is that the injury be "fairly traceable" to the challenged conduct. Id. (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)).
Standing is also subject to certain prudential limitations that reflect the need for judicial restraint. One such limitation is that a plaintiff typically must assert his own legal rights and cannot rest his claim on third-party interests. Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). However, an exception to that rule is that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." Id. at 511, 95 S.Ct. 2197. Whether an association has standing to sue on behalf of some or all of its members depends on whether
(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
Standing, be it individual or associational, goes to whether a litigant is entitled to have a court decide a particular case. "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." Warth, 422 U.S. at 518, 95 S.Ct. 2197. That inquiry is "especially rigorous" where, as here, "reaching the merits of a dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Raines v. Byrd, 521 U.S. 811, 819-20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

A. FAIR
The Government argues that any threat of injury from enforcement of the Solomon Amendment would be to law schools, whose involvement as unidentified members of FAIR is insufficient to satisfy the associational standing requirement that one or more members has standing in their own right. The Government further argues that merely naming law school members of FAIR is insufficient to demonstrate standing where (1) none of the factual allegations demonstrate that the law schools, as part of larger parent universities, are entitled to bring suit on their own behalf and potentially against the wishes of the parent institution; (2) the parent institutions, not the law schools, have standing in their own right insofar as they make the ultimate decision to comply with the Solomon Amendment and stand to suffer a denial of funding pursuant thereto; and (3) law schools violate the prudential rule against third-party standing by resting their claims on the legal rights of their parent universities that are not involved in this suit. Lastly, the Government contends that FAIR does not satisfy the requirements for associational standing insofar as the as-applied challenge to the Solomon Amendment demands participation of individual members in the lawsuit.
The Court will first analyze whether FAIR members have standing in their own right. See Hunt, 432 U.S. at 343, 97 *286 S.Ct. 2434. FAIR members include law schools and law faculties that collectively voted to join FAIR.[6] (Am.Compl.ś 7). The Second Amended Complaint describes the alleged harm to FAIR members as follows:
Every member of FAIR has autonomy to develop policies directed at enhancing its academic atmosphere and safeguarding its ability to recruit and retain diverse students. Every member of FAIR exercised that autonomy to adopt a policy that prohibits discrimination on the basis of, among other categories, sexual orientation. Every member of FAIR requires those employers who seek to use the law schools' career placement offices, facilities and resources to abide by these non-discrimination policies. Every member of FAIR applies these non-discrimination policies to all employers, and has declined to make an exception for military recruiters. As a direct result of the Solomon Amendment, or the DOD's interpretation and application of the Solomon Amendment, every FAIR member has entirely suspended the application of its non-discrimination policy to military recruiters, including any symbolic gestures to signal its adherence to non-discrimination. Every member of FAIR believes that the suspension of its non-discrimination policy has compromised the message of non-discrimination that FAIR members previously sent to their communities and has undermined its efforts to provide its students and faculty with an atmosphere conducive to the free exchange of ideas.
(Am.Compl.ś 7(d)).
Taking Plaintiffs' allegations to be true, as the Court must, FAIR has satisfied its burden to demonstrate that it has law school members who have abandoned their non-discrimination policies due to threatened enforcement of the Solomon Amendment. The Solomon Amendment plainly affects law schools; the Government concedes that any threatened injury from the statute would be to law schools. (Gov't Opp'n Prelim. Inj. at 11). FAIR alleges that its law school members' First Amendment rights have been violated by virtue of having to compromise their message of non-discrimination due to the Solomon Amendment. Thus, FAIR members have alleged a concrete injury fairly traceable to the Solomon Amendment that is likely to be redressed were enforcement of the statute enjoined. See Warth, 422 U.S. at 501-02, 95 S.Ct. 2197; Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130.
It is true that FAIR members have not as of yet suffered an actual loss of funding pursuant to enforcement of the Solomon Amendment. But law school members of FAIR have a sufficient stake in this controversy insofar as the allegations demonstrate that the schools have capitulated to government threats of losing federal funding due to non-compliance with the Solomon Amendment. The relevant injury for standing purposes is the government-induced abandonment of the schools' nondiscrimination policies and not, as the Government urges, an actual loss of funding.
Nor does the secrecy of FAIR's membership list defeat standing. FAIR membership is kept secret to allay members' fears of retaliatory efforts on behalf of the government and private actors if the law schools were to participate as named plaintiffs in a legal challenge. (Am. Compl.ś 7(b); Greenfield Decl. śś 5-6). The fear is that

*287 Members of Congress will cancel appropriations to their sister institutions behind closed doors and that Government bureaucrats will reject contracts or grants or will decline to renew them â all without any explanation, but as punishment for what they view as an affront to the military. They also fear that they and their sister institutions will be singled out for virulent and unfair attacks by politicians and in the press, attacks that have already materialized in such mainstream media outlets as the Wall Street Journal, The Legal Times, and Fox News. Such attacks, unfairly mischaracterizing the lawsuit and the interests of FAIR's members in the lawsuit, expose FAIR's members and their sister institutions to the loss of students, the anger of alumni, and the loss of donations.
(Am.Compl.ś 7(b)). While the Court cannot evaluate such fears, it agrees with Plaintiffs, for the reasons that follow, that FAIR need not reveal its membership list at the pleading stage in order to bring suit on its members' behalf.
In Doe v. Stincer, 175 F.3d 879, 881 (11th Cir.1999), an Advocacy Center brought a claim on behalf of mentally ill patients alleging that the Americans with Disabilities Act preempted a Florida statute that blocked patient access to certain medical records. The Attorney General of the State of Florida argued that the Advocacy Center lacked standing to sue on behalf of its members because "it has not brought suit on behalf of a specific individual who" had suffered harm traceable to the statute at issue. Id. at 884. The Eleventh Circuit Court of Appeals disagreed, concluding that the association was not required to "name the members on whose behalf suit is brought." Id. at 882 ("[U]nder Article III's established doctrines of representational standing, we have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought and we decline to create such a requirement...."). The court went on to explain that "it is enough for the representational entity to allege that one of its members or constituents has suffered an injury that would allow it to bring suit in its own right." Id. at 885. The court ultimately dismissed the complaint because the Advocacy Center failed to allege "that one of its constituents otherwise had standing to sue to support the district court's grant of summary judgment and injunctive relief." Id. at 886.
FAIR has done what the Advocacy Center in Doe failed to do â allege facts establishing that one or more of its members have suffered an injury sufficient to confer standing in their own right. The Court declines the Government's invitation to require that FAIR take the next step and publicly name all of its members.
Authorities cited by the Government do not suggest a different result. See United States v. AVX Corp., 962 F.2d 108 (1st Cir.1992); American Immigration Lawyers Ass'n v. Reno, 18 F.Supp.2d 38 (D.D.C.1998); Clark v. Burger King Corp., 255 F.Supp.2d 334 (D.N.J.2003); Kessler Inst. for Rehabilitation v. Mayor & Council of Essex Fells, 876 F.Supp. 641 (D.N.J. 1995). In United States v. AVX Corp., the First Circuit Court of Appeals held that an environmental organization's assertions of environmental injury were not specific enough to sustain a claim of associational standing because it had asserted "only the most nebulous allegations regarding its members' identities and their connection to the relevant geographic area." 962 F.2d at 117. The court described the deficiency as follows:
The averment has no substance: the members are unidentified; their places *288 of abode are not stated; the extent and frequency of any individual use of the affected resources is left open to surmise. In short, the asserted injury is not anchored in any relevant particulars.... A barebones allegation, bereft of any vestige of a factual fleshing-out, is precisely the sort of speculative argumentation that cannot pass muster where standing is contested.
Id.
Likewise, in American Immigration Lawyers Ass'n v. Reno, the District Court for the District of Columbia held that immigrant associations lacked associational standing because the organizational plaintiffs failed to demonstrate that their members possessed standing. 18 F.Supp.2d at 52. That case involved challenges to a summary removal process pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. There, the plaintiff organizations failed to demonstrate that their membership included immigrants who suffered an injury-in-fact and thus would have standing in their own right. Plaintiffs' complaint stated that "[m]embers of some of the Plaintiff organizations have sought and will continue to seek asylum in the United States." Id. at 51. The complaint generally alleged harm to members of all organizations, and identified vague groups of members that might suffer harm. Id. The court noted that the obligation to allege facts sufficient to establish injury to its members "extends to identifying the member or members" of the organization, and went on to explain that "[n]owhere in their pleadings do the plaintiffs identify one injured person by name, allege that the injured person is a member of one of the plaintiff organizations (naming the specific organization), or allege facts sufficient to establish the harm to that member." Id. The complaint even conceded that it would be "impossible" to identify individual refugees before they suffered harm. Id. Based on those allegations, the court concluded that the plaintiff associations had failed to allege facts sufficient to establish that its members had standing in their own right. Id. at 52.
While the factual allegations in AVX Corp. and American Immigration Lawyers Ass'n suffered from a common deficiency â no showing that association members had suffered an injury-in-fact â the necessary particulars were case-specific. Geographic location was critical to establishing members' injury-in-fact in the environmental context, AVX Corp., 962 F.2d at 117, whereas exposure to expedited removal proceedings was critical to establishing members' injury-in-fact in the immigration context. American Immigration Lawyers Ass'n, 18 F.Supp.2d at 51. Here, the necessary particulars are that FAIR has members who have suffered an injury-infact traceable to the Solomon Amendment. Plaintiffs have alleged that FAIR has law school members and that those members maintain non-discrimination policies to which they cannot adhere due to restrictions imposed by the Solomon Amendment. There are no remaining uncertainties as to the effect of the Solomon Amendment on FAIR law school members. Thus, the factual allegations are sufficient to confer associational standing on FAIR.
Similarly unavailing is Kessler Inst. for Rehabilitation v. Mayor & Council of Essex Fells, in which a non-profit organization dedicated to advocacy and support for handicapped persons in New Jersey failed to establish associational standing to bring suit on behalf of its members. 876 F.Supp. at 656. The sole allegation about the advocacy group was that it was
a non-profit corporation in the state of New Jersey, having offices at Passaic County Administration Building, 317 *289 Pennsylvania Avenue, Paterson, New Jersey, which has as its principal purpose the provision of services, including advocacy, information, referral and support for handicapped persons in Passaic County and the State of New Jersey.
Id. The complaint did not even allege that the advocacy group had members, let alone that its members had suffered injury as a result of the challenged governmental action. Given the plaintiff association's failure "to identify a single member" of the association, the Court could not ascertain whether "any of [the association's] members has suffered an injury sufficient to confer standing." Id.; see also Clark v. Burger King Corp., 255 F.Supp.2d 334, 335 (D.N.J.2003) (holding organization dedicated to enforcement of Americans with Disabilities Act lacked standing to bring suit on behalf of its members for denial of handicapped access to restaurants given failure "to identify which members visited which restaurants on which dates and when such members plan to return") (citing Kessler, 876 F.Supp. at 656). Clearly, the district court in Kessler was grappling with whether the plaintiff association had any members who had standing in their own right. That is not the case here. Plaintiffs' allegations and sworn declarations are sufficient to demonstrate that FAIR's members have suffered harm sufficient to confer standing in their own right. The Government's argument places undue emphasis on language requiring plaintiff associations to "identify" or "name" members. Such language in the cited authorities goes not to a blanket rule that associations seeking to bring suit on behalf of their members must identify their membership, but rather to whether the factual allegations in a given context sufficiently demonstrate that an association indeed has members that have suffered an injury-in-fact.
Even if FAIR were obligated to identify a member to establish associational standing, it has done so. Plaintiffs' Second Amended Complaint names two members of FAIR â Golden Gate University School of Law ("Golden Gate Law") and the Faculty of Whittier Law School ("Whittier Law"). (Am.Compl.ś 7(d)). The Complaint alleges that Golden Gate Law maintains a policy against use of its career services office and facilities by discriminatory employers; that it was threatened by the DOD with a complete cutoff of federal funds if found out of compliance with the Solomon Amendment; and that, due to that threat, it suspended its policy with respect to the military. (Id.) Similarly, the Complaint alleges that Whittier Law faculty adopted a non-discrimination policy; that, pursuant to the school's policy, the director of career services disinvited military Judge Advocate General representatives and removed all recruiting materials from the career offices shelves; that it was threatened by the DOD with a complete cutoff of federal funds if found out of compliance with the Solomon Amendment; and that, because of the DOD's threat, it capitulated to the military's demands. (Am.Compl.śś 7(f)-(g)). The allegations concerning Golden Gate University School of Law and Whittier Law faculty are sufficient to establish that FAIR members have standing in their own right to bring this action.
The Court also rejects the Government's argument that the named FAIR members do not have standing in their own right because there is no allegation that, as mere components of a larger parent university, the schools are "entitled" to bring suit on their own behalf, "potentially against the wishes of the parent institution." In support of that proposition the Government cites only to the Hunt requirement that members have standing in *290 their own right. That requirement goes to whether members satisfy the injury, causation, and redressability factors for Article III standing, and not to whether members have either the capacity to bring suit or the blessings of their respective parent institutions to do so. See Felson v. Miller, 674 F.Supp. 975, 977-78 (E.D.N.Y.1987) (explaining difference between standing and capacity to sue). The Court declines to impose the capacity requirement requested by the Government for purposes of standing.
The Government further argues that FAIR members lack standing because the decision to comply with the Solomon Amendment was not made by the law schools, alone, but by their parent institutions. The Court disagrees. Plaintiffs' Second Amended Complaint specifically alleges that "[a]s a direct result of the Solomon Amendment, or the DOD's interpretation and application of the Solomon Amendment, every FAIR member has entirely suspended the application of its nondiscrimination policy to military recruiters." (Am Compl. ś 7(h)). The decision to suspend the non-discrimination policies, even if at the direction of a parent university, was made in direct response to the Solomon Amendment. In any event, the vast majority of law schools that suspended their policies did so by vote of the law school faculty. (Rosenkranz Decl. Opp'n Gov't 2nd Mot. to Dismiss ś 6).
Finally, the Court rejects the Government's argument that the law schools do not satisfy the prudential requirement of standing that a party cannot rest its claim on the legal rights or interests of third parties. See Warth, 422 U.S. at 499, 95 S.Ct. 2197. As Plaintiffs correctly point out, the Government's argument confuses penalty with injury. The alleged injury in this case is that of the law schools being forced to abandon policies of non-discrimination. As such, the law schools are asserting their own rights and not the rights of their parent institutions. That a law school might choose to abandon its policy, in part, because it does not want its parent institution to suffer a loss of funding, does not alter the nature of the injury suffered by the law school. Nor does it follow that theoretical standing on the part of parent universities somehow forecloses standing of law schools in their own right.
The Court concludes that the factual allegations concerning FAIR and its membership are sufficient to establish that FAIR members have standing in their own right, and FAIR need not identify the remainder of its membership at this juncture.[7] Accordingly, prong one of the test for associational standing is satisfied. See Hunt, 432 U.S. at 343, 97 S.Ct. 2434.
The Government does not dispute that FAIR has satisfied the germaneness prong of associational standing, and the Court so concludes. See Hunt, 432 U.S. at 343, 97 S.Ct. 2434. FAIR's stated mission is "to promote academic freedom, support educational institutions in opposing discrimination and vindicate the rights of institutions of higher education." (Am. Compl.ś 7(a)). Its members "recognize and agree that the non-discrimination policies of each of its members is central to their missions." (Id.). The interests FAIR seeks to protect in this suit â the right of law schools to adhere to their non-discrimination policies â are on all fours *291 with FAIR's stated purpose. The Court accordingly finds the germaneness prong satisfied.
FAIR also satisfies the third requirement of associational standing, that members' individual participation is not necessary. See Hunt, 432 U.S. at 343, 97 S.Ct. 2434. The Third Circuit has held that there is no need for individual member participation where, as here, only injunctive and declaratory relief is sought. Roe v. Operation Rescue, 919 F.2d 857, 865-66 (3d Cir.1990); see also Hospital Council of Western Pa. v. City of Pittsburgh, 949 F.2d 83, 89 (3d Cir.1991) (noting that the Supreme Court has consistently held that requests by associations for declaratory and injunctive relief do not require participation by individual association members). Yet, the Government argues that Plaintiffs' as-applied challenge to the Solomon Amendment requires individualized participation to the extent that Plaintiffs assert that "the military has demanded that law schools actively disseminate the military's literature and make arrangements for military recruiters," that recruiters have "threaten[ed] harsh sanctions for conduct that is not at all apparent on the statute's face," and that the military has failed to "offer[ ] any guidance or consistency as to what will be permitted." Those claims, the Government contends, necessarily require participation of the particular schools in question and an evaluation of the specific factual circumstances alleged to have occurred. The Court disagrees.
The Government misconstrues the nature of Plaintiffs' as-applied challenge. Plaintiffs' as-applied challenge is not that there is something unconstitutional about the manner in which the Government is applying the Solomon Amendment to a particular institution. It is that the Government is applying a statute and its implementing regulations to almost every law school in the nation in a way that violates the law schools' First Amendment rights. So viewed, Plaintiffs as-applied challenge does not require individualized determinations. The Court is satisfied that resolution of the claims asserted herein and the relief requested do not require participation of individual FAIR members.

B. SALT, LAW PROFESSORS, LAW STUDENT ASSOCIATIONS, & LAW STUDENTS
The Government challenges the standing of the law professors and law students for failure to satisfy the injury-in-fact and causation requirements. Specifically, the Government argues that the Solomon Amendment affects only funds flowing to institutions, not to professors or students, and does not prevent any individual from expressing disagreement with the statute or the military's policy regarding homosexual conduct. The Government further argues that the alleged injury to law professors and students amounts to stigmatic or dignitary injury, without personal harm, that is insufficient to confer standing. Finally, the Government argues that the harm to students and law professors is not directly traceable to the Solomon Amendment insofar as it resulted from the schools' independent choice to suspend their non-discrimination policies.
Plaintiffs respond that law professors and students do not claim to be silenced by the Solomon Amendment, nor do they claim to be harmed due to a generalized objection to the Government's message. The law professors and law students are suing because "the Government is interfering with a learning environment that law schools constructed for [their] benefit." (Plaintiffs' Reply Br. at 4). Plaintiffs further argue that the alleged harm to students and law professors is directly traceable *292 to the Government's conduct because, but for the Solomon Amendment, the law schools would not have suspended their respective non-discrimination policies.
Like FAIR, SALT and the Law Student Associations must demonstrate that (a) their members would otherwise have standing to sue in their own right; (b) the interests they seeks to protect are germane to their purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt, 432 U.S. at 343, 97 S.Ct. 2434. The parties have not briefed associational standing of SALT and the Law Student Associations. As noted, the Government challenges standing of those organizations only insofar as it argues that the professors and students lack standing in their own right. Because it is incumbent on this Court to determine that standing exists, the Court will analyze each of the factors for associational standing of SALT and the Law Student Associations. Chong v. District Dir., Immigration & Naturalization Serv., 264 F.3d 378, 383 (3d Cir.2001) ("[C]ourts must decide Article III standing issues, even when not raised by the parties, before turning to the merits.") (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)).

1. SALT
SALT is an organization of law professors from various law schools throughout the nation. (Am.Compl.ś8). The law schools where SALT members teach have implemented non-discrimination policies that allow law professors to "pursue scholarly goals and prepare their students for the practice of law in an atmosphere that encourages debate, celebrates diversity and promotes the ideals of respect and tolerance within their communities." (Am. Compl.śś 8(a),(b)). Plaintiffs allege that SALT members are "both beneficiaries and recipients of the messages of nondiscrimination sent by the policies and they are harmed by their respective law schools' suspension of" those policies. (Am.Compl.ś 8(e)). The alleged injury to SALT members is that, due to the Solomon Amendment, they are unable to benefit from the enriched pedagogical environment created by non-discrimination policies. (Am.Compl.śś 8(c)-(e)). SALT members who were instrumental in the development and implementation of non-discrimination policies at their respective law schools claim an additional injury of no longer being able to send their schools' message free from interference due to the Solomon Amendment. (Am.Compl.ś (f)). In short, SALT members claim that they are being denied "the fulfillment of [their] educational mission and the meaningful exercise of [their] own rights of academic freedom." (Johnson Reply Decl. ś 7).
Whether SALT members have standing in their own right turns on whether they have alleged an injury-in-fact fairly traceable to the Solomon Amendment that is likely to be redressed by a favorable judicial decision. See Warth, 422 U.S. at 501-02, 95 S.Ct. 2197; Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130. It is well settled that the Constitution protects the exchange of information, both as to the speaker and the intended recipient. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("[W]here a speaker exists, ... the protection afforded is to the communication, to its source and to its recipients both."); Board of Educ., Island Trees Union Free School Dist. v. Pico, 457 U.S. 853, 867, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) ("[T]he Constitution protects the right to receive information and ideas."); Lamont v. Postmaster General, 381 U.S. 301, 305-06, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (recognizing right to *293 receive publications free from government interception); Kleindienst v. Mandel, 408 U.S. 753, 762-63, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (recognizing right to "receive information and ideas" as being "nowhere more vital than in our schools and universities"). SALT members allege an intrusion on their right to receive, benefit from, and, in some cases, send information â the law schools' message of non-discrimination. That injury is unlike the vague and generalized concerns held insufficient to support standing in Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (psychological consequence of disagreeing with governmental conduct) and ASARCO, Inc. v. Kadish, 490 U.S. 605, 616, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (teachers association members' "special interest in the quality of education"). The Court concludes that SALT members have alleged a sufficiently concrete and particularized harm to their right to receive, benefit from, and, in some cases, send the message of non-discrimination.
Next, it must be determined whether the alleged harm to SALT members is fairly traceable to the Solomon Amendment or, as the Government argues, is due to an independent decision on the part of the law schools that breaks the chain of causation. Particularly on point is Pitt News v. Fisher, 215 F.3d 354 (3d Cir.2000). There a student newspaper sued the Attorney General of the State of Pennsylvania to enjoin enforcement of a state statute that imposed criminal penalties on businesses that advertised alcoholic beverages in materials "published by, for or in behalf of any education institution." Id. at 357. The Attorney General challenged the student newspaper's standing on the ground that its alleged injury â reduction in advertising revenues â was caused by the advertisers' independent decision not to purchase advertising for fear of criminal prosecution, not the statute itself. Id. at 360-61. The Third Circuit disagreed, reasoning that the newspaper's injury was traceable to the statute because the advertisers would not have ceased purchasing advertisements in the student newspaper but for the challenged statute. Id. Likewise, the chain of causation is not broken here because the law schools would not have suspended their non-discrimination policies as to military recruiting but for the Solomon Amendment. The Court concludes that the alleged harm to SALT members is fairly traceable to the Solomon Amendment.
SALT members also meet the redressability requirement for standing. The alleged harm to SALT members â governmental intrusion on their right to receive, benefit from, and, in some cases, send the message of non-discrimination â would be redressed were enforcement of the Solomon Amendment to be enjoined and the schools reinstated their respective non-discrimination policies as to the military. The Court accordingly finds that SALT has alleged facts sufficient to establish that its member law professors have standing in their own right.
The Government does not dispute that SALT satisfies the germaneness and individual participation prongs of associational standing, and the Court finds that those factors are met. According to the Declaration of SALT's co-president, Michael Rooke-Ley, SALT is dedicated to "enhanc[ing] the quality of legal education, and extend[ing] the power of law to underserved individuals and communities." (Rooke-Ley Decl. ś 3). Consistent with that mission, members of SALT have been instrumental in requiring law schools to adhere to non-discrimination policies as a way to combat discrimination in the legal *294 profession. (Id. ś 4). SALT members consider the non-discrimination policies, and the values expressed by those policies, to be central to their mission and their role as law professors. (Id. ś 6). The germaneness prong is satisfied because SALT's mission is sufficiently broad to encompass the interests championed in this suit.
Finally, this litigation does not demand or depend on the individual participation of SALT members. No case-by-case determination need be made as to individual professors. And, as previously noted, the Third Circuit has held that there is no need for individual member participation where, as here, only injunctive and declaratory relief is sought. Roe, 919 F.2d at 865-66; Hospital Council of Western Pa., 949 F.2d at 90.

2. Law Professors
Just as SALT members have standing to bring this action, so too do the Law Professors. Erwin Chemerinsky and Sylvia Law, as faculty members of USC Law and NYU Law, respectively, are beneficiaries, senders, and recipients of the message of non-discrimination sent by their schools' non-discrimination policies. (Am. Compl.ś 11). The Law Professors allege that they can no longer send or receive the messages of non-discrimination due to the Solomon Amendment. (Id.). For reasons discussed supra, the alleged harm to professors is sufficient to confer standing to bring this action.

3. Law Student Associations
The Government challenges the standing of the Law Student Associations primarily on the basis that students do not have standing in their own right. Specifically, the Government argues that students are not directly affected by the Solomon Amendment, they have not otherwise alleged a legally cognizable injury, and that any harm to the students is the result of the law schools' independent choice to comply with the Solomon Amendment, not the statute itself. Plaintiffs respond that students, as beneficiaries of law school policies directed at increasing diversity, inculcating values, and fostering an environment of open and respectful debate, are harmed to the extent that they can no longer receive the educational messages sent by their law schools.
Plaintiffs CFE and RGLC are student associations at Boston College Law School and Rutgers University School of Law, respectively. (Am.Compl. ś9). CFE was formed in direct response to Boston College Law School's capitulation to military threats of a funding cut-off; specifically, the faculty's September 2002 decision to suspend the school's non-discrimination policy as it applied to sexual orientation and to permit the military to recruit on campus with the assistance of the school's career services office. (Smolik Decl. ś 1). CFE has distributed symbolic ribbons, circulated petitions urging the faculty to reinstate the non-discrimination policy, held discussion groups, sought to educate others about the Solomon Amendment, and held rallies during on-campus military recruitment visits. (Smolik Decl. ś 2). The record discloses no comparable particulars about the genesis of RGLC, revealing only that both organizations "are committed to furthering the rights and interests of all groups including gays and lesbians." (Am. Compl.ś 9).
The Court will first consider whether Student Association members have standing in their own right to bring this action. Members of the Law Student Associations are student beneficiaries of law school non-discrimination policies who allege that the Solomon Amendment interferes with their right to receive educational *295 messages sent by their respective law schools. (Id.). Instructive on that point is N.J.-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Bd. of Higher Ed., 654 F.2d 868, 878 (3d Cir.1981), where the Third Circuit recognized a right of students to acquire knowledge. In that case students alleged infringement of their First Amendment right "in education to express, transmit and receive ideas" by virtue of the licensing requirements imposed on institutions of higher education by New Jersey law. Id. at 871. The Third Circuit recognized students' rights as listeners:
The Supreme Court has held that the "opportunities of pupils to acquire knowledge," is a first amendment right distinct from the right to impart knowledge. Meyer v. Nebraska, 262 U.S. 390, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Moreover, the Court has recently emphasized that the distinct "first amendment right `to receive information and ideas' .... is nowhere more vital than in our schools and universities." Kleindienst v. Mandel, 408 U.S. 753, 762-63, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).... Supreme Court precedent clearly indicates that the students have distinct rights which may be enforced....
Id. at 878. Clearly, students have a legally cognizable right to receive information and messages sent by their schools. The Court concludes that law student members have alleged a legally cognizable injury sufficient to satisfy the injury-in-fact requirement of standing.
Next, it must be determined whether the alleged harm to student members' rights is "fairly traceable" to the Solomon Amendment. Lujan, 504 U.S. at 560, 112 S.Ct. 2130. For reasons discussed supra, the alleged harm to law students is fairly traceable to the Solomon Amendment. See Pitt News, 215 F.3d 354. There is little doubt that, but for the Solomon Amendment, law school non-discrimination policies would have remained in effect. Nor is there any doubt that the harm to students would be redressed if enforcement of the Solomon Amendment were enjoined. With the injury-in-fact, causation, and redressability requirements established, the Court finds that student members of CFE and RGLC have standing in their own right to bring this action.
Next, it must be determined whether the Law Student Associations satisfy the germaneness and individual participation prongs of associational standing. The stated purpose of the Law Student Associations â to further the interests and rights of all groups, including gays and lesbians â is concededly broad. However, that purpose does encompass vindication of student rights to benefit from the pedagogical environment created by non-discrimination policies. See Hospital Council of Western Pa., 949 F.2d at 88 (rejecting argument that association cannot satisfy germaneness requirement unless its purpose is narrow or specific). The record demonstrates that CFE was created in direct response to suspension of the law school's non-discrimination policy as to the military. Thus, the Court is satisfied that its purpose is germane to the interests championed herein. Likewise, RGLC's commitment to furthering the interests of gays and lesbians necessarily encompasses the objections raised herein â i.e., conflict between law school non-discrimination policies and military's discriminatory practices concerning homosexual conduct. The Court is satisfied that there is a sufficient theoretical identity of interest between law student members and both Law Student Associations to satisfy the germaneness prong of associational standing.
Lastly, the Court finds that the Law Student Associations satisfy the individual *296 participation prong. This case does not demand any fact-sensitive determinations concerning individual members of the Law Student Associations. The Law Student Associations can fully represent their members' interests. Moreover, as already noted, the injunctive and declaratory relief requested does not require individual member participation. Roe, 919 F.2d at 865-66; Hospital Council of Western Pa., 949 F.2d at 90.
The Court accordingly concludes that the Law Student Associations have standing to bring suit on behalf of their student members.

4. Law Students
Plaintiff Law Students, as "beneficiaries of law school policies increasing diversity and directed at inculcating values and fostering an environment in which respectful debate unfolds," allege harm to their right to receive educational messages sent by their law school due to the Solomon Amendment. (Am.Compl.ś 10). For reasons discussed supra, the Court concludes that alleged governmental interference with a message sent by academic institutions to their students amounts to an invasion of the students' legally protected interests that is fairly traceable to the Solomon Amendment. The Court also finds a likelihood of redress to the Law Students were enforcement of the statute enjoined. The Court accordingly concludes that the Law Students have standing to bring this action.

III. Conclusion
For the foregoing reasons, the Government's Motion to Dismiss Plaintiffs' Second Amended Complaint for Lack of Standing will be denied as to all plaintiffs.

PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
To obtain preliminary injunctive relief Plaintiffs must establish four well-settled conditions: (1) a "reasonable likelihood" of success on the merits; (2) a likelihood of "irreparable harm" absent the relief sought; (3) the harm to plaintiffs by denying preliminary injunctive relief outweighs the harm to the government by granting such relief; and (4) preliminary injunctive relief would serve the public interest. Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 157 (3d Cir.2002), cert. denied, Borough of Tenafly v. Tenafly Eruv Ass'n, Inc., ___ U.S. ___, 123 S.Ct. 2609, 156 L.Ed.2d 628 (2003). The inquiry as to likelihood of success on the merits of Plaintiffs' constitutional claims, to which the Court now turns, is a separate inquiry from the threshold determination of Article III standing. That is, "[a] party may demonstrate standing to litigate a claim even if they fail to make out a constitutional violation on the merits." Pitt News, 215 F.3d at 360, 361 n. 4. It follows that the Court's conclusion as to standing is not determinative of whether Plaintiffs have established a likelihood of success on the merits of their constitutional claims. The parties have not separately addressed the First Amendment claims of the law students and law professors in connection with the preliminary injunction request, though their standing arguments are extensive, and the Court will not do so in the analysis that follows. In any event, the students and law professors are entitled to no greater protection than the law schools whose interests are most directly implicated by the Solomon Amendment.
The ultimate question presented is whether the Solomon Amendment is likely to withstand constitutional scrutiny. Plaintiffs contend that the Solomon *297 Amendment is constitutionally infirm because it conflicts with law school recruiting policies, which are "saturated with First Amendment value" and lie at the intersection of three distinct First Amendment rights (academic freedom, freedom of expressive association, and free speech). Plaintiffs' position is that application of three distinct constitutional doctrines (the doctrine of unconstitutional conditions, the prohibition against viewpoint discrimination, and the void-for-vagueness doctrine) compels a finding of unconstitutionality. The Government disagrees and relies heavily on Congress' broad power under the Spending Clause and its constitutional mandate to raise and support armies.
This case raises multiple issues of constitutional law, so for clarity the Court will briefly set forth the structure of its analysis. First, the Court will address whether the Solomon Amendment creates an unconstitutional condition by forcing law schools to abandon their First Amendment rights on pain of losing federal funding, and thereby impinges on the First Amendment rights of the law schools and other plaintiffs. Typically, Congress has wide latitude in imposing conditions on the receipt of federal funding. This wide latitude, though, is not without bounds, and traditional Spending Clause analysis will not suffice in situations where, as here, there is tension between the spending power and the First Amendment. Where the exercise of the spending power implicates First Amendment interests, the doctrine of unconstitutional conditions becomes applicable and holds that the government cannot condition a benefit on the relinquishment of a constitutional right. Thus, the Court will examine the substance of the conditions imposed by the Solomon Amendment and their impact on First Amendment rights. The Court notes, however, that the Solomon Amendment does not directly restrict speech, making this case factually different from prior cases applying the doctrine of unconstitutional conditions.
Second, the Court will address Plaintiffs' contention that the Solomon Amendment discriminates on the basis of viewpoint by promoting a pro-military recruiting message and punishing only those schools that exclude the military because of their belief that the military's recruiting policy is a moral wrong.
Finally, the Court will examine the Solomon Amendment and its implementing regulations to determine if they are unconstitutionally vague.

I. The Unconstitutional Conditions Claim

A. Facial v. As-Applied Challenges
The Court begins its analysis by considering Plaintiffs' argument that the Solomon Amendment is unconstitutional, both facially and as applied. Plaintiffs argue that this case includes a facial challenge because Congress cannot command law schools even to admit the military to campus to "disseminate its recruiting message so long as that message is anathema to their mission and undermines their expressive goals." As framed by Plaintiffs, the as-applied challenge to the Solomon Amendment focuses on the manner in which the military has been interpreting the statute, i.e., requiring law schools to provide affirmative assistance to military recruiters. It is clear that the alleged interference with Plaintiffs' First Amendment interests is comparatively greater in the as-applied situation because the potential entanglement with the military is greater when law schools are required to provide affirmative assistance to military recruiters than it is when they are only required to allow military recruiters on campus. However, the Court need not *298 linger on the difference between the facial and as-applied challenges because it rejects Plaintiffs' contention that the Solomon Amendment is unconstitutional as applied. To the extent the Solomon Amendment may require law schools to offer affirmative assistance to military recruiters, the alleged intrusion on Plaintiffs' First Amendment interests still falls short of a constitutional violation. And if the Solomon Amendment survives the as-applied challenge, it follows that it survives the facial challenge as well since the alleged infringement on Plaintiffs' First Amendment interests resulting from the mere presence of military recruiters on campuses is even less. Put another way, if the Solomon Amendment can be applied constitutionally, Plaintiffs' facial challenge must fail. See United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (holding that a facial challenge to constitutionality of a statute will only succeed if a plaintiff can "establish that no set of circumstances exists under which the Act would be valid"). With this distinction in mind, the Court will analyze Plaintiffs' as-applied challenge.[8]

B. The Spending Clause
As this matter concerns a congressional attempt to attach certain conditions to the receipt of federal funds, and not a regulatory restriction, the Spending Clause is the appropriate starting point for assessing the constitutionality of the Solomon Amendment. The Constitution empowers Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." South Dakota v. Dole, 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (internal citations and quotation marks omitted). The Supreme Court has repeatedly emphasized that "Congress has wide latitude to attach conditions to the receipt of federal assistance in order to further its policy objectives." United States v. American Library Ass'n, ___ U.S. ___, ___, 123 S.Ct. 2297, 2303, 156 L.Ed.2d 221 (2003) (citing Dole, 483 U.S. at 206, 107 S.Ct. 2793); see also Rust v. Sullivan, 500 U.S. 173, 197-98, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Of particular import here, the constitutional limitations on Congress when it exercises its spending power "are less exacting than those on its authority to regulate directly." Dole, 483 U.S. at 209, 107 S.Ct. 2793. There is, therefore, a basic difference between a federal spending program and a federal regulatory program. See Legal Services Corp. v. Velazquez, 531 U.S. 533, 551, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (Scalia, J., dissenting) (citing Maher v. Roe, 432 U.S. 464, 475, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)).
In addition, it is evident that the Solomon Amendment furthers important policy objectives. The Constitution empowers Congress to "raise and support Armies," U.S. CONST. art. I, § 8, cl. 12, and "Congress considers access to college and university *299 employment facilities by military recruiters to be a matter of paramount importance." United States v. City of Philadelphia, 798 F.2d 81, 86 (3d Cir. 1986). The salient issue, then, is whether Congress has rightly exercised its broad power under the Spending Clause to achieve the policy objective of maintaining an effective military through on-campus recruiting efforts. Proper resolution of this issue, however, compels an inquiry that goes beyond traditional Spending Clause analysis.

C. Intersection Between Spending Clause and First Amendment
Notwithstanding the wide latitude afforded to Congress to set spending priorities, the congressional spending power is not unlimited; other constitutional provisions may provide an independent bar to the conditional grant of federal funds. Dole, 483 U.S. at 208, 107 S.Ct. 2793. Plaintiffs are thus correct in pointing out that the Spending Clause cannot categorically trump the Bill of Rights. See Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (veteran's tax benefit cannot be conditioned on loyalty oath); FCC v. League of Women Voters, 468 U.S. 364, 370-71, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (grant of federal funds to broadcasting stations cannot require that stations refrain from editorializing); see also Finley, 524 U.S. at 571, 118 S.Ct. 2168 (noting that First Amendment has application in subsidy context). Traditional Spending Clause analysis does not apply in situations where the spending power clashes with First Amendment rights. In those circumstances, the doctrine of unconstitutional conditions, which holds that the government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests, circumscribes the otherwise broad reach of the spending power. See Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).
Plaintiffs argue that the Solomon Amendment violates the doctrine of unconstitutional conditions because it forces law schools to abandon their constitutionally-protected academic freedom and their speech and associational rights to avoid a cut-off of federal funding. Defendants respond that the Solomon Amendment does not impose an unconstitutional condition on any institution's protected First Amendment rights because it is not conditioned on, or related to, speech; or alternatively, if the Solomon Amendment does affect speech, the effect is incidental. Defendants therefore argue that the Solomon Amendment is a valid exercise of the Spending Clause.
Prior cases discussing the doctrine of unconstitutional conditions fail to provide a controlling framework for assessing the Solomon Amendment's constitutionality. A review of those cases reveals that the Supreme Court was guided by two overarching principles, neither of which bear directly on this case, as the Solomon Amendment does not directly target speech or, as will be seen, discriminate on the basis of viewpoint.
First, when the Government appropriates public funds to establish a program it is entitled to define the limits of that program. Rust, 500 U.S. 173, 111 S.Ct. 1759; American Library Ass'n, ___ U.S. ___, 123 S.Ct. 2297. In Rust, the Supreme Court rejected a First Amendment free-speech challenge to a federal funding scheme for family planning services which denied such funds to any program providing abortion counseling. 500 U.S. at 192, 111 S.Ct. 1759. The Court noted that the Government can, "without violating the Constitution, selectively fund a program to encourage certain activities it *300 believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem another way." Id. at 193, 111 S.Ct. 1759. Similarly, in American Library Ass'n, the Supreme Court held that the Children's Internet Protection Act ("CIPA") did not impose an unconstitutional condition on public libraries. ___ U.S. at ___, 123 S.Ct. at 2307. CIPA denied public libraries federal funding to provide Internet access unless they installed software to block obscene or pornographic images. In rejecting the unconstitutional conditions claim brought by the recipients of these funds, the Court stated that "`the Government [was] not denying a benefit to anyone, but [was] instead simply insisting that public funds be spent for the purposes for which they were authorized.'" ___ U.S. at ___, 123 S.Ct. at 2308 (quoting Rust, 500 U.S. at 196, 111 S.Ct. 1759). Because the Government spending program was limited in both Rust and American Library Ass'n, the Government could constitutionally "make a value judgment ... and ... implement that judgment by the allocation of public funds." Rust, 500 U.S. at 192-93, 111 S.Ct. 1759 (citations omitted). Put differently, the Government may make viewpoint-based funding decisions in instances in which the Government itself is the speaker. Velazquez, 531 U.S. at 541, 121 S.Ct. 1043.
Although both Rust and American Library Ass'n stand for the proposition (advanced by the Government) that the Government has wide latitude in conditioning the receipt of federal funds even in circumstances implicating First Amendment rights, they addressed narrow spending programs. Here, there is no Government spending "program" as in Rust or American Library Ass'n. The funds at issue under the Solomon Amendment are those flowing from certain parts of the Government to any higher education institution for various purposes. While that distinction distances this case from Rust and American Library Ass'n, it does not compel the conclusion (advanced by Plaintiffs) that the Solomon Amendment transgresses the wide latitude granted Congress in both those cases. Both cases are factually distinct in another way. Within the scope of the spending programs in those cases, the governmental interference with a well-defined constitutional right was direct and categorical. Indeed, particular viewpoints which were contrary to the Government's value judgments were entirely suppressed. The Solomon Amendment, by contrast, does not directly or entirely exclude a point of view. For reasons discussed in more detail below, the Solomon Amendment's interference with speech and other protected rights is incidental. As such, the Court concludes that the principles established in Rust and American Library Ass'n, although instructive, cannot be squarely applied to the Solomon Amendment.
Second, the government cannot use its funds in a way that is "aimed at the suppression of ideas thought to be inimical to the Government's own interest." Velazquez, 531 U.S. at 549, 121 S.Ct. 1043 (prohibiting legal services funding to any organization that represented clients in effort to amend or otherwise challenge existing welfare law); Speiser, 357 U.S. 513, 78 S.Ct. 1332 (denial of tax exemption for engaging in proscribed speech); see also Regan v. Taxation with Representation of Wash., 461 U.S. 540, 550, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). Where the Government itself does not speak or subsidize transmittal of a message it favors, view-point-based distinctions are improper. Velazquez, 531 U.S. at 548-49, 121 S.Ct. 1043; Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (university created *301 limited public forum by subsidizing student fund, from which it impermissibly excluded religious publications); see also American Library Ass'n, ___ U.S. at ___ n. 7, 123 S.Ct. at 2309 n. 7. These cases involved the direct suppression of ideas, through the withholding of funding, tax benefits or subsidies from those who would express those ideas. Whether these cases are controlling depends on whether the Solomon Amendment suppresses speech or substantially inhibits the exercise of other protected rights.
The Court believes that the principles established in prior cases applying the doctrine of unconstitutional conditions are too fact-specific to provide an easy or appropriate avenue for analyzing the novel constitutional issues raised by the Solomon Amendment. Law school recruiting policies have First Amendment value and the Solomon Amendment has an effect on Plaintiffs' First Amendment interests. However, at the intersection between the Spending Clause and the First Amendment, the mere presence of a constitutionally protected interest does not render the Solomon Amendment unconstitutional.
A finding of an unconstitutional condition presupposes that there is a relinquishment of a constitutional right. See Perry, 408 U.S. at 597, 92 S.Ct. 2694 (noting that if government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited). In other words, the Solomon Amendment, as an exercise of the congressional spending power, will not create an unconstitutional condition unless the alleged infringement on Plaintiffs' First Amendment interests rises to the level of a constitutional violation. This determination, given the fact that First Amendment jurisprudence resists generalities and usually requires delicate balancing, requires the Court to carefully examine the First Amendment rights at issue here and the Solomon Amendment's impact thereon. For the reasons explained herein, the Solomon Amendment does not transgress constitutional boundaries.

D. First Amendment Interests

1. Academic Freedom
Plaintiffs aver that a law school's policy of non-discrimination â and its application of that policy to employer recruiting â has pedagogical value by pronouncing values that students do not necessarily learn from casebooks and lectures and by helping to nurture an environment conducive to free and open discourse. They argue that if academic freedom means anything, it means that the decision as to what to teach is the law schools' to make, without governmental interference. But as Justice O'Connor opined in a different First Amendment context, "reliance on categorical platitudes is unavailing." Rosenberger, 515 U.S. at 847, 115 S.Ct. 2510 (O'Connor, J., concurring). Like most freedoms, the right to academic freedom is not absolute. See Barenblatt v. U.S., 360 U.S. 109, 112, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959).
The constitutional importance of academic freedom has long been recognized. See Grutter v. Bollinger, ___ U.S. ___, ___, 123 S.Ct. 2325, 2339, 156 L.Ed.2d 304 (2003); Keyishian v. Board of Regents of Univ. of State of N.Y., 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Sweezy v. New Hampshire by Wyman, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Wieman v. Updegraff, 344 U.S. 183, 195, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring); see also Board of Regents of Univ. of Wisconsin v. Southworth, 529 U.S. 217, 237 n. 3, 120 S.Ct. 1346, 146 *302 L.Ed.2d 193 (2000) (Souter, J., concurring). It is true that the Court must give "a degree of deference to a university's academic decisions, within constitutionally prescribed limits." Grutter, ___ U.S. at ___, 123 S.Ct. at 2339 (holding that student body diversity is a compelling state interest that can justify use of race in university admissions). However, a university is not impervious to competing societal interests. Barenblatt, 360 U.S. at 112, 79 S.Ct. 1081 (noting that an "educational institution is not a constitutional sanctuary from inquiry into matters that may otherwise be within the constitutional legislative domain merely for the reason that inquiry is made of someone within its walls"). That such institutions occupy a "special niche in our constitutional tradition" implies that they remain part of, and not sovereign to, that constitutional tradition. Grutter, ___ U.S. at ___, 123 S.Ct. at 2339. An educational institution should not be able to erect an insurmountable or impenetrable wall against opposing public interests. Rather, the interests of educational institutions to shape their own pedagogical environments must be considered in proper context and not in disregard of any controlling facts or competing interests. See id. at 2338 (citing Gomillion v. Lightfoot, 364 U.S. 339, 343-44, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) ("admonishing that `in dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts'")).
The difficulty in evaluating the constitutional significance of Plaintiffs' claim to academic freedom is that the precise contours of this First Amendment interest are somewhat unclear. The concept of academic freedom seems to be inseparable from the related speech and associational rights that attach to any expressive organization or entity. To be sure, cases involving academic freedom have almost exclusively dealt with direct and serious infringements on individual teachers' speech or associational rights. Southworth, 529 U.S. at 237 n. 3, 120 S.Ct. 1346; see also Wieman, 344 U.S. 183, 73 S.Ct. 215 (state statute requiring state employees to take loyalty oath that they are not affiliated with subversive organizations); Sweezy, 354 U.S. 234, 77 S.Ct. 1203 (investigation by state attorney general into professor's political ideology and content of classroom lectures); Shelton; 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (state statute requiring teachers to file affidavits giving names and address of all organization to which they had belonged); Keyishian, 385 U.S. 589, 87 S.Ct. 675 (state statute requiring removal of teachers based on treasonable or seditious words). The Solomon Amendment, unlike the statutes at issue in those cases, cannot be said to "cast a pall of orthodoxy over the classroom," because professors remain free to speak and teach as they please. Keyishian, 385 U.S. at 603, 87 S.Ct. 675. The Solomon Amendment, on its face, does not interfere with academic discourse by condemning or silencing a particular ideology or point of view. While the Solomon Amendment undoubtedly interferes with law school recruiting policies, the effect on speech and associational rights is more attenuated than in the cases just cited. Thus, notwithstanding the broad acknowledgment of the constitutional importance of academic freedom, those cases fail to provide the Court with an independent path to review an alleged infringement on the right to academic freedom; which is to say, without *303 reference to the related and attendant rights of free expression.
For purposes of the Court's analysis in this case, the right to academic freedom is not cognizable without a foundational free speech or associational right. If the Solomon Amendment violates Plaintiffs' right to academic freedom, it is because it also intrudes on their rights to free speech and expressive association. Accordingly, the Court will turn its attention to those First Amendment rights.

2. Free Speech and Associational Rights
Plaintiffs argue that the law schools' rights are not different from the First Amendment rights of free speech and expressive association that attach to any organization with an expressive purpose. In Boy Scouts of America v. Dale, the Supreme Court held that a state law requiring the Boy Scouts to accept an avowed homosexual and gay rights activist as an assistant scoutmaster violated the Boy Scouts' First Amendment right of expressive association. In so holding, the Court articulated a three-step process to analyze a group's expressive association claim. 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). First, the Court considered whether the group making the claim engaged in expressive association. Id. Second, the Court analyzed whether the governmental action at issue significantly affected the group's ability to advocate public or private viewpoints. Id. at 653, 120 S.Ct. 2446. Lastly, the Court weighed the governmental interest implicated in the action against the burden imposed on the associational expression to determine if the governmental interest justified the burden. Id. at 656, 120 S.Ct. 2446 (noting that freedom of expressive association is not absolute); see also Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh, 229 F.3d 435, 442 (3d Cir. 2000) (applying three-step process to expressive association claim of university fraternity chapter). To succeed on an expressive association claim, a group must satisfy all three prongs. See Dale, 530 U.S. at 656, 120 S.Ct. 2446.

(a) Expressive Association
As the Third Circuit has recognized, "[t]he Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity." Pi Lambda Phi Fraternity, Inc., 229 F.3d at 443. The First Amendment's protection of expressive association extends beyond pure advocacy groups. A group must merely engage in some form of expression, whether it be public or private, that could be impaired in order to be entitled to protection. Dale, 530 U.S. at 655, 120 S.Ct. 2446. "The expansive notions of expressive association used in ... Dale demonstrate that there is no requirement that an organization be primarily political (or even primarily expressive) in order to receive constitutional protection for expressive associational activity." Pi Lambda Phi Fraternity, Inc., 229 F.3d at 443. It is nevertheless incorrect to say there is no threshold for expressive activity claims; rather, there is a de minimis threshold for a finding that a group engages in expressive association. See id. at 444 (holding fraternity chapter did not engage in constitutionally protected expressive association). Under this liberal interpretation of expressive association, there appears to be no doubt that the law schools qualify as expressive associations entitled to constitutional protection.
In Dale, the Court opined that it "seems indisputable that an association that seeks to transmit such a system of values engages in expressive activity." 530 U.S. at 650, 120 S.Ct. 2446. The Boy Scouts *304 claimed that its goal was to "instill values in young people." Id. at 649-50, 120 S.Ct. 2446. The record reveals that the law schools, too, seek to inculcate a certain set of values and principles in their students. Plaintiffs assert that the law schools believe that invidious discrimination on the basis of sexual orientation is a moral wrong, and that "judgments about people bearing no relation to merit harm and inhibits students, faculty, and eventually society at large." Plaintiffs further assert that their non-discrimination policies help inculcate those values. And whereas the Boy Scouts Oath and Law did not expressly mention the particular value that it claimed the government was undermining â homosexual conduct as an unacceptable form of behavior â the law schools' non-discrimination policies explicitly include sexual orientation.
Furthermore, although it could be argued that the law schools do not exist for the sole purpose of disseminating one particular viewpoint, "associations do not have to associate for the `purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment." Id. at 655, 120 S.Ct. 2446. It is also not fatal to the law schools' claim of expressive association that certain members of the law school community conceivably disagree with the law schools' conception of tolerance or other related moral norms. The First Amendment does not require that every member of a group agree on every issue. Id. The law schools have adopted official policies with respect to sexual orientation, and this is sufficient for First Amendment purposes. As such, the law schools qualify as expressive associations.

(b) Degree of Interference
Given that the law schools engage in expressive association, the inquiry turns to whether the forced inclusion on their campuses of an unwanted periodic visitor would significantly affect the law schools' ability to express their particular message or viewpoint. The Court believes it does not.
The right to freedom of speech protected by the First Amendment against state intrusion includes both the right to speak freely and the right to refrain from speaking at all. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 633-34, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (Murphy, J., concurring). "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." Wooley v. Maynard 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (citing Barnette, 319 U.S. at 637, 63 S.Ct. 1178). Just as the First Amendment may prohibit the government from suppressing or infringing on speech, it may also prevent the government from compelling individuals to express certain views. See id. Within First Amendment jurisprudence, therefore, there exist two analytically independent constitutional violations: message suppression and compelled speech. Plaintiffs argue that the Solomon Amendment combines both violations. On the one hand, Plaintiffs contend that the Solomon Amendment muddles (i.e., suppresses) the law schools' messages since they cannot credibly proclaim "we do not abet acts of discrimination" when they do. On the other hand, Plaintiffs also claim that the Solomon Amendment, as applied by the military, compels law schools to endorse, or even subsidize, the military's expressive effort in recruiting by assisting military recruiters.
Just as the Court must give deference to the law schools' assertions regarding the nature of their expression, the Court must *305 also give deference to the law schools' view of what would impair that expression. Dale, 530 U.S. at 653, 120 S.Ct. 2446. Even so, the law schools cannot "erect a shield" against opposing public interests simply by asserting that the mere presence of an unwanted visitor would impair its message. See id. This degree of deference, therefore, does not preclude the Court from conducting an independent inquiry into whether the Solomon Amendment significantly intrudes on the law schools' expressive and associational interests.

(i) Message Dilution
Plaintiffs claim that the Solomon Amendment presents the same constitutional violation found in Dale â muddling of a speaker's message. In Dale, the Boy Scouts asserted that homosexual conduct was inconsistent with the values embodied in the Scout Oath and Law, and that the organization did not want to promote homosexual conduct as an acceptable form of social behavior. Dale, an assistant scoutmaster, was co-president of a gay and lesbian organization and a vocal gay rights activist. His continued presence in the Boy Scouts, not merely as a member but as a leader, would surely force the organization to send a message, both to youth members and the world, that the Boy Scouts accepted homosexual conduct as an acceptable form of behavior. The Court thus found a "severe intrusion" on the Boy Scouts' right to freedom of expressive association. Id. at 660, 120 S.Ct. 2446.
Dale is distinguishable from this case. The communicative and associational effect of periodic visits of a military recruiter to a university campus or job fair is vastly different from the presence of a gay scoutmaster in the Boy Scouts, a private membership organization. The application of the state anti-discrimination law required the Boy Scouts to accept a gay rights activist not merely as a member but as an assistant scoutmaster. The significant intrusion on the Boy Scouts' associational rights did not result from the fact that they were forced to accept as a member a person with whom they disagreed. As the Supreme Court noted, "the presence of an avowed homosexual and gay rights activist in an assistant scoutmaster's uniform sends a distinctly different message from the presence of a heterosexual assistant scoutmaster who is on record as disagreeing with the Boy Scouts policy." Dale, 530 U.S. at 655-56, 120 S.Ct. 2446. There is no question that the forced inclusion of an openly gay assistant scoutmaster would significantly undermine the Boy Scouts' ability to express its viewpoint and thereby inculcate its values in younger members. Here, the Solomon Amendment does not compel the law schools to accept the military recruiters as members of their organizations, not to mention bestow upon them any semblance of authority. Indeed, the military recruiters are actually present on campuses only a few times per year. The military recruiter, by definition, is not a member of the law school community. He or she is a visitor, and, in fact, a periodic visitor among many competing visitors. At best, the military recruiter is like the heterosexual assistant scoutmaster who disagrees with the Boy Scouts' policy; he or she does little to compromise the free speech and expressive association rights of the law schools.
The law schools are free to proclaim their message of diversity and tolerance as they see fit, to counteract and indeed overwhelm the message of discrimination which they feel is inherent in the visits of the military recruiters. While there is tension between the Solomon Amendment and law school recruiting policies, there are ways of relieving that tension by taking ameliorative measures to distance the *306 law schools from the military's discriminatory policy. And notwithstanding the Solomon Amendment's effect on those policies, which are a means of inculcating the law schools' value system, there is no realistic danger, given the AALS' recommended ameliorative measures, that it will significantly compromise the law schools' ability to disseminate their messages. The law schools' anecdotal examples in evidence are said to support the argument that "[t]he message is not getting through." (Pls.' Br. Supp. Prelim. Inj. at 16-17). On the contrary, the message of non-discrimination is at the heart of the annual controversy, and is therefore replayed and re-endorsed every time there is a controversy on any law school campus. The fact that one NYU Law student (Sweeney Decl. ś 15) and some other law students profess to no longer believe the message of non-discrimination does not change the fact that the message is being disseminated, loudly and clearly, as suggested by the AALS. It follows that the Court is unpersuaded that the degree of intrusion on the law schools' right to expressive association is comparable to the governmental intrusion found in Dale.

(ii) Compelled Speech
The Solomon Amendment merely conditions federal funds on campus and student access for military recruiting, and therefore, it is not an outright compulsion of speech. There is nothing in the record to indicate that the Solomon Amendment requires law schools to speak, in the linguistic or verbal sense, on behalf of the military recruiters or the military's alleged recruiting message. Rather, Plaintiffs argue that the Solomon Amendment compels law schools to endorse, or even subsidize, the military's expressive effort in recruiting by admitting military recruiters to campus and assisting their recruiting efforts.
Plaintiffs rely heavily on Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), in arguing that the Solomon Amendment compels the schools to endorse the military's recruiting `message.' In Hurley, the Supreme Court applied traditional First Amendment analysis in holding that a local anti-discrimination ordinance could not constitutionally be applied to compel the organizers of Boston's St. Patrick's Day parade to include a gay, lesbian, and bisexual contingent ("GLIB") marching under its own banner. Id. at 581, 115 S.Ct. 2338. An important point in Hurley was that the parade organizers wanted to exclude GLIB members not because of their sexual orientation (they were free to march in the parade) but because they wanted to march behind the GLIB banner. Indeed, GLIB was formed for the very purpose of marching in the parade in order to express as a message its members' pride as openly gay, lesbian, and bisexual individuals of Irish heritage. The Supreme Court found that a parade is an inherently expressive activity, and perhaps more importantly, that GLIB's participation as a unit in the parade was "equally expressive." Id. at 571, 115 S.Ct. 2338. It therefore violated the First Amendment to force the parade organizers to include messages they found inimical. Id. at 569-70, 115 S.Ct. 2338.
The Court further noted that the anti-discrimination ordinance did not, "on its face, target speech or discriminate on the basis of its content." Id. at 572, 115 S.Ct. 2338. The Court stated that such laws "do not, as a general matter, violate the First and Fourteenth Amendments." Id. Nevertheless, given the expressive character of both the parade and the marching GLIB contingent, the Court found that the statute had been applied in a manner such as to require the parade organizers to alter *307 the expressive content of their parade. Id. at 573, 115 S.Ct. 2338.
Hurley is also distinguishable from this case. To begin with, GLIB was formed to express a message. The military recruiters are not seeking access to campuses and students with the primary purpose of expressing the message that disapproval of openly gay conduct within the armed forces is morally correct or justifiable. That some see the military only for its discriminatory policy does not support the conclusion that the military is similar to GLIB in its expressive purpose. The Solomon Amendment, on its face, reveals that the reason the military seeks access to these campuses is to recruit, i.e., interview applicants and offer jobs. A recruiting function or job fair is fundamentally different from a parade in its communicative content. At the very least, a recruiting event on campus or a job fair off campus is substantially less expressive than a parade. Compare Hurley, 515 U.S. at 569, 115 S.Ct. 2338 (noting that "parades are public dramas of social relations, and in them performers define who can be a social actor and what subjects and ideas are available for communication and consideration") (citations omitted). The purpose of an expressive parade is to celebrate a particular ideological viewpoint. That is the obvious reason why groups having opposing viewpoints tend to have their own separate parades. As every parade also tends to have a common theme, so every contingent marching behind a banner in a parade is understood to contribute something to that theme. The content of the overall message of the parade in Hurley would therefore be dramatically affected by the forced inclusion of GLIB. Both the parade organizers and GLIB sought to expressly convey messages through the medium of an inherently expressive activity. The same cannot be said about the military's presence at a recruiting function.
This case resembles Hurley only if recruiting were held to be essentially expressive activity proclaiming the discriminatory message of the military. Plaintiffs argue that recruiting is at least as communicative as soliciting contributions and proselytizing. However, this argument does not withstand careful inspection. As the Supreme Court has noted, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes â for example walking down the street or meeting one's friends at the shopping mall â but such a kernel is not sufficient to bring the activity within the protections of the First Amendment." City of Dallas v. Stanglin, 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (finding insufficient the expressive content of dance-hall gatherings); see also United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled `speech'...."). Although the Court is unwilling to conclude that recruiting has no expressive content, any such expressive content is ancillary to the practical and overriding purpose of recruiting â the hiring of future employees.
For this reason, recruiting differs dramatically from soliciting contributions and proselytizing. Soliciting contributions implicates a variety of free speech interests â "communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes â that are within the protection of the First Amendment." Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 631, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). Because charitable solicitations are "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues," the flow of such information *308 would likely cease without solicitation. Id. at 632, 100 S.Ct. 826. Where the component parts of a single expressive activity are inextricably intertwined, as in the case of soliciting contributions, both the speech and non-speech parts receive full constitutional protection. See Riley v. National Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). Soliciting contributions is simply impossible without the concomitant advocacy of a particular cause or viewpoint. The financial component of soliciting contributions is a mere means to achieving the intended result, to wit, the propagation of ideological points of view. And there can be no more robust First Amendment interest than the dissemination of ideas or the advocacy of causes. Recruiting does not implicate the same free speech interests. The dissemination or propagation of views and ideas forms, if at all, only a fraction of the recruiting process. Recruiting has an economic or functional motive; the advocacy of causes, which lies at the very heart of solicitation, is virtually absent. The Court therefore refuses to confer upon this "kernel of expression" the constitutional equivalence of soliciting contributions. See Village of Schaumburg, 444 U.S. at 631, 100 S.Ct. 826 (noting that "charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services").
Proselytizing is even less similar to recruiting than soliciting contributions. To proselytize is to "convert from one religion, belief, opinion, or party to another." Webster's Third New International Dictionary 1821 (1993). The Court fails to see how the recruiting of potential employees is as communicative or expressive as proselytizing to change one's beliefs or opinions. Recruiting and proselytizing are not equivalents in the constitutional sense. And because recruiting has a dominant functional purpose, it lacks the requisite communicative content necessary to make this case analogous to Hurley.
Furthermore, as each contingent marching in a parade is necessarily understood to contribute something to a common theme, there is no customary means for private sponsors to disavow any identity of viewpoint between themselves and the selected participants. Hurley, 515 U.S. at 576, 115 S.Ct. 2338. Thus, the use of disclaimers "would be quite curious in a moving parade." Id. (comparing Prune-Yard Shopping Center v. Robins, 447 U.S. 74, 87, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (owner of shopping mall "can expressly disavow any connection with the message by simply posting signs in the area where the speaker ... stands")). "[A] parade's overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole." Id. at 577, 115 S.Ct. 2338. In contrast, law schools can effectively disclaim any recruiting message and can easily distance themselves ideologically from the military recruiters. Unlike a parade, a recruiting function does not proclaim an overall message which could be destroyed by the presence of an individual recruiter, especially where disclaimers can expressly disavow any ideological connection to that recruiter.
In short, if there is any expressive component to recruiting, it is entirely ancillary to its dominant economic purpose. Because recruiting activities on a campus or at a job fair, although not entirely without communicative content, are far less expressive than a parade and other such highly expressive activities like soliciting contributions and proselytizing, and because the presence of military recruiters is far less expressive than a contingent *309 marching behind a banner, the effect on First Amendment interests in requiring law schools to open themselves up to military recruiters is far more attenuated. Plaintiffs' reliance on Hurley is therefore unavailing.
Apart from Hurley, Plaintiffs argue that the military's application of the Solomon Amendment compels them to endorse a message which they abhor. The compelled endorsement to which Plaintiffs object does not involve words, which convey a clear ideological message. Instead, the alleged compulsion is indirect and less precise: it involves the conduct of law schools in permitting or assisting a recruiting activity. A threshold issue, then, is whether this conduct is expressive. See Troster v. Pennsylvania State Dep't of Corr., 65 F.3d 1086, 1091 (3d Cir.1995), cert. denied, 516 U.S. 1047, 116 S.Ct. 708, 133 L.Ed.2d 663 (1996).
Conduct must be "sufficiently imbued with elements of communication" to implicate the First Amendment. Spence v. Washington, 418 U.S. 405, 409-10, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); Troster, 65 F.3d at 1090 (rejecting corrections officer's claim that regulation requiring wearing of an American flag patch violated First Amendment by compelling him to engage in expressive conduct); Tenafly Eruv Ass'n, Inc., 309 F.3d at 161 (finding that residents failed to establish that affixing of lechis to utility poles to create eruv was expressive conduct entitled to First Amendment protection). The test, as articulated by the Third Circuit, is "whether, considering the `nature of [the] activity, combined with the factual context and environment in which it was undertaken,'" ... "the activity [is] sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments ..." Tenafly Eruv Ass'n, 309 F.3d at 159 (citations omitted); Troster, 65 F.3d at 1090. This is a fact-sensitive, context-dependent inquiry. Tenafly Eruv Ass'n, 309 F.3d at 159; Troster, 65 F.3d at 1090.
The relevant activity at issue for purposes of a compelled speech analysis is that of the law schools in assisting the military recruiters. The essence of Plaintiffs' claim is that law schools are being required to endorse the military's recruiting `message.' The Court believes that the law schools' actions in assisting military recruiters are insufficiently imbued with elements of communication to require the protection of the First Amendment. The Solomon Amendment does not compel law schools to say anything. While allowing or even assisting military recruiters on campus could be viewed as a dilution of the law schools' message of non-discrimination, it is far different from endorsing the military's policy towards sexual orientation, particularly where, as here, there is no restriction on speech or conduct disclaiming any such endorsement. This case does not present the scenario of directly requiring a private speaker to participate in the dissemination of a particular message, as in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (forcing a conscientious objector to say the pledge of allegiance); Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (forcing a citizen to display state's motto); Pacific Gas & Electric Co. v. Public Utilities Commission of California, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality) (forcing utility company to distribute potentially adverse propaganda with billing statements); Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (forcing a newspaper to provide space to political candidates it opposes). Such cases involved an outright regulation on speech and a patent attempt by the government to "prescribe *310 what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Barnette, 319 U.S. at 642, 63 S.Ct. 1178. Conditioning receipt of federal funds upon an educational institution's willingness to assist the military's recruiting efforts involves a less serious infringement upon First Amendment liberties than compelling the affirmative act of a flag salute or even the passive act of carrying the state motto on one's license plate. Facilitating interviews and even disseminating recruiting literature on behalf of military recruiters, when a law school does all these things for every other potential employer in the context of a large recruiting function, are not obvious endorsements of a particular ideological point of view. The Court therefore rejects Plaintiffs' contention that the Solomon Amendment requires law schools to endorse the military's recruiting `message.'
To sum up, the presence of the military on campus does not significantly intrude upon the law schools' ability to express their views, thus presenting a very different situation than those considered in Dale or Hurley. The Court believes that this difference is constitutionally significant. As the presence of military recruiters on campuses or job fairs does not significantly affect the law schools' ability to espouse or advocate their own viewpoints, Plaintiffs' claim of expressive association fails the second prong of the framework established in Dale. Therefore, there is no unconstitutional infringement on the law schools' free expression rights.
Having determined that the inclusion of a periodic visitor in the context of a large recruiting function does not significantly affect the law schools' ability to express their message, the Court need not reach the third step of the Dale analytical framework. Yet, even if Plaintiffs survived the second step of the Dale analysis by demonstrating that the Solomon Amendment significantly affects law schools' free speech and associational interests, Plaintiffs' claim that these rights have been violated still fails, as such rights can be overridden by competing governmental interests. Dale, 530 U.S. at 648, 120 S.Ct. 2446.

(c) Balancing of Interests
The final step in the Dale analysis involves balancing the First Amendment interests implicated by the Solomon Amendment with competing societal interests to determine whether the statute transgresses constitutional boundaries. Plaintiffs argue that because the Solomon Amendment burdens academic freedom, along with speech and associational rights, it cannot withstand constitutional scrutiny unless it passes a heightened scrutiny test, i.e., that it was "adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means less restrictive of associational freedoms." Dale, 530 U.S. at 648, 120 S.Ct. 2446. Plaintiffs maintain that the Solomon Amendment fails both prongs of this test. However, without deciding whether the Solomon Amendment would survive this heightened level of scrutiny, the Court believes that this test does not apply here.
It is true that in Dale the Supreme Court adopted a heightened scrutiny test because the state action directly affected the groups' associational activities. But as the Third Circuit noted in Pi Lambda Phi Fraternity, Inc., there are three different levels of scrutiny to state actions affecting expression, "depending on the character of the relationship between the state action and the protected expression." 229 F.3d at 445. The most rigorous standard of review is triggered when the state action directly burdens expressive rights. Dale *311 involved this kind of direct effect, as the state statute in question required the Boy Scouts to accept an unwanted member in a leadership position. Id. at 445-46. A less stringent, intermediate scrutiny test is appropriate in circumstances where the state action has only an incidental effect on the right to free expression. Id. at 446 (citing O'Brien, 391 U.S. 367, 88 S.Ct. 1673). And since almost every governmental action can be characterized as having some indirect effect on First Amendment interests, "indirect and attenuated effects on expression do not rise to the level of a constitutional violation." Id. at 439. Thus, in circumstances where there is neither direct regulation of protected expression nor an incidental effect on such expression, the state action in question does not merit even the intermediate scrutiny test. Id. at 447 (citing Arcara v. Cloud Books, Inc., 478 U.S. 697, 704-05, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986)).
As an initial matter, the Solomon Amendment differs from the anti-discrimination statute at issue in Dale in two important respects. First, the Solomon Amendment does not require law schools to accept unwanted persons as leaders of their expressive organizations. Second, the Solomon Amendment is not a regulatory restriction; it is an exercise of the congressional spending power. Thus, the Solomon Amendment affects associational rights in an indirect and less immediate fashion. Compare Dale, 530 U.S. at 659, 120 S.Ct. 2446 (holding that public accommodations law directly and immediately affected associational rights). As such, the most rigorous standard of review employed by the Supreme Court in Dale is not applicable here.
The Solomon Amendment literally conditions campus-based funding on the allowance of the military on campus for recruiting purposes. Because there is little that is inherently expressive about the act of permitting military recruiters access to campus (or providing assistance to recruiters), the statute targets conduct, not speech. See, e.g., Hurley, 515 U.S. at 572, 115 S.Ct. 2338 (noting that public accommodations statute did not, on its face, target speech since it focuses on the act of discriminating); Jews for Jesus, Inc. v. Jewish Community Relations Council of N.Y., Inc., 968 F.2d 286, 295 (2d Cir.1992) (holding that discrimination statutes are aimed at conduct, i.e. discrimination, not speech); see also Wisconsin v. Mitchell, 508 U.S. 476, 487, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) (noting that Title VII is a permissible content-neutral regulation of conduct). But as an expressive element can be subsumed within otherwise non-communicative conduct, the mere fact that the Solomon Amendment might target conduct, and not speech, does not insulate it from constitutional scrutiny. Here, the law schools have adopted policies against discrimination on the basis of sexual orientation. As corollaries to these non-discrimination policies, law schools also maintain policies against offering their resources, support, or endorsement to any employer that discriminates. By conditioning federal funding on campus access for military recruiters, the Solomon Amendment has an undeniable but incidental effect on these policies. A communicative or expressive element therefore exists in the conduct targeted by the Solomon Amendment. As such, the applicable standard of review is found in United States v. O'Brien, 391 U.S. 367, 388, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (applying medium scrutiny test to state action having an incidental effect on right to free expression).[9]
*312 It is well established that the government may constitutionally regulate conduct even if such regulation entails an incidental limitation on speech. O'Brien, 391 U.S. at 375, 88 S.Ct. 1673. "[W]hen `speech' and `nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." Id. at 376, 88 S.Ct. 1673. A government regulation is sufficiently justified "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id. at 377, 88 S.Ct. 1673. Given that the Solomon Amendment targets conduct but nevertheless entails an incidental limitation on First Amendment freedoms, it must survive this intermediate level of scrutiny to pass constitutional muster under the third step of the Dale analysis.
The Constitution empowers Congress to raise and support a military. See U.S. CONST. art. I, § 8 (providing that "Congress shall have the Power ... To raise and support Armies"). "The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping." Id. (citing Lichter v. United States, 334 U.S. 742, 755-58, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918)). If Congress possesses the power to conscript manpower for military service and the concomitant power to enact legislation in furtherance thereof, it also possesses the lesser power to recruit manpower for military service and enact the necessary enabling legislation. See id. (citing Lichter, 334 U.S. at 756, 68 S.Ct. 1294; Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (noting that power of Congress to classify and conscript manpower is beyond dispute)). Hence, the Solomon Amendment is within the constitutional power of Congress.
It is also evident that the Solomon Amendment furthers an important governmental interest. Pursuant to its constitutional grant of authority, Congress has imposed on the military an affirmative obligation to "conduct intensive recruiting campaigns to obtain enlistments" in the Armed Forces. 10 U.S.C. § 503(a). And as the Third Circuit has recognized, "Congress considers access to college and university employment facilities by military recruiters to be a matter of paramount importance." United States v. City of Philadelphia, 798 F.2d at 86. Indeed, in O'Brien, the Supreme Court stated that it is "apparent that the Nation has a vital interest in having a system for raising armies that functions with maximum efficiency and is capable of easily and quickly responding to continually changing circumstances." 391 U.S. at 381, 88 S.Ct. 1673. Access to law schools and their students is an integral part of the military's effort to conduct "intensive recruiting campaigns to obtain enlistments." 10 U.S.C. § 503(a). Clearly, then, the Solomon Amendment furthers a substantial and important interest in gaining access to law schools for purposes of military recruiting and thereby assuring the effectiveness of raising a volunteer military. And whereas in Dale the state interests embodied in a public *313 accommodations law did not justify "such a severe intrusion" on the Boy Scouts' right to expressive association, here the relatively modest intrusion is outweighed by the compelling governmental interest in on-campus military recruiting. 530 U.S. at 660, 120 S.Ct. 2446.
Even so, to avoid constitutional difficulty, the Solomon Amendment's incidental restriction on First Amendment freedoms must be "no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377, 88 S.Ct. 1673. Plaintiffs, relying on a heightened standard of review, argue that any interest the Government has in recruiting students could be achieved by less burdensome means as there are other ways in which the military can recruit students without the assistance of law school personnel. Even assuming, without deciding, that the governmental interest presented in the Solomon Amendment could be achieved through less burdensome means, the O'Brien test does not demand such precision. Later Supreme Court cases have stated that to satisfy the O'Brien standard, "a regulation need not be the least speech-restrictive means of advancing the Government's interests." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). "[A]n incidental burden on speech is no greater than is essential, and therefore is permissible under O'Brien, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." U.S. v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). "Narrow tailoring in this context requires, in other words, that the means chosen do not burden substantially more speech than is necessary to further the government's legitimate interests." Turner Broad. Sys., Inc., 512 U.S. at 662, 114 S.Ct. 2445 (citations omitted). Such regulations are not invalid "simply because there is some imaginable alternative that might be less burdensome on speech." Albertini, 472 U.S. at 689, 105 S.Ct. 2897.
The Solomon Amendment passes constitutional review under this standard. Law schools universally provide assistance to employers who do not discriminate (Rosenkranz Decl. ś 7). As a preliminary matter, then, military recruiters are placed at a disadvantage as compared to other competing employers without the assistance of the law schools. Although it may be true, as Plaintiffs argue, that military recruiters can still contact students and interview students either off-campus or at some on-campus location, this ignores the fact that a law school recruiting function is the chief mechanism of connecting current law students with future employers. Without access to such mechanisms, the substantial governmental interest in gaining access to campuses for the purpose of military recruiting will be achieved less effectively.
Moreover, as previously stated, the Solomon Amendment is not a regulatory restriction; educational institutions remain free to reject military recruiters. But if educational institutions desire the assistance of federal funding, they must allow the military to fulfill its congressional directive "to conduct intensive recruiting campaigns to obtain enlistments." 10 U.S.C. § 503(a). Most importantly, these institutions remain free to voice objections to the military and its internal policies and to take ameliorative actions to distance themselves from the military's discriminatory policy. And for the reasons already set forth, the Court believes that the actual effect of the Solomon Amendment on the speech and associational rights of law schools is relatively minor. The Solomon Amendment therefore does not suppress "substantially more speech than ... necessary" to ensure the effectiveness of on-campus military recruiting. Turner *314 Broad. Sys., Inc., 512 U.S. at 668, 114 S.Ct. 2445 (citations omitted).[10]
Finally, the Solomon Amendment is also unrelated to the suppression of ideas. A law school or institution of higher learning that prohibits or in effect prevents military recruiters from gaining entry to campus or access to students will be disentitled to those funds regardless of the viewpoint that prompted the decision to deny assistance to such recruiters or prohibit them from campuses. See discussion infra. Additionally, as already stated, law schools are free to take ameliorative actions to disclaim any endorsement of the military's recruiting policy; in fact, law schools can outright denounce the military without running afoul of the Solomon Amendment's prohibitions. For the non-communicative impact of their conduct, and for nothing else, will law schools transgress the Solomon Amendment. See O'Brien, 391 U.S. at 383, 88 S.Ct. 1673.
Plaintiffs nonetheless allege that the purpose behind the Solomon Amendment was entirely related to the suppression of ideas. In support of this contention, Plaintiffs point to certain statements in the legislative, history. But as the Supreme Court stated in O'Brien, "inquiries into congressional motives or purposes are a hazardous matter." 391 U.S. at 383, 88 S.Ct. 1673. "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." Id.; see also Turner Broad. Sys., Inc., 512 U.S. at 652, 114 S.Ct. 2445. This Court, likewise, refuses to strike down a congressional statute "which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a `wiser' speech about it." O'Brien, 391 U.S. at 384, 88 S.Ct. 1673. Here, the overriding congressional purpose is unrelated to the suppression of speech.
Accordingly, the Solomon Amendment passes constitutional muster under the O'Brien framework for governmental actions having an incidental effect on speech.

E. Conclusion
For the foregoing reasons, the Solomon Amendment does not unconstitutionally infringe Plaintiffs' free speech and associational rights. Even when considered against the background of academic freedom, the alleged intrusion on Plaintiffs' speech and associational rights falls short of a constitutional violation. Accordingly, there is no unconstitutional condition.

II. Viewpoint Discrimination Claim
Plaintiffs argue that the text of the Solomon Amendment, as well as the military's implementation of that text, discriminates on the basis of viewpoint by promoting only a pro-military recruiting message and by punishing only those schools that exclude the military because of a belief that the military's recruiting policy is immoral. This contention is unavailing. The Solomon Amendment does not "rais[e] the specter that the Government may effectively drive certain ideas or *315 viewpoints from the marketplace." Turner Broad. Sys., Inc., 512 U.S. at 640, 114 S.Ct. 2445 (quoting Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd., 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)). Even if the Solomon Amendment affects speech, the impact on speech is incidental, and there is virtually no risk of excising specific ideas or viewpoints from the public discourse. A law school that prevents military recruiters from gaining access to campus or students will forfeit federal funding regardless of the viewpoint that prompted the decision to deny access to such recruiters. More importantly, an institution that decides to accept federal funding and not prevent military recruiters from gaining access to campus or students remains free to voice objections and take ameliorative actions to disassociate itself from the military recruiters. This decision may impact expression by affecting a recruiting policy, but an indirect effect on speech, without more, cannot sustain a claim for invidious viewpoint discrimination. See Turner Broad. Sys., Inc., 512 U.S. at 643, 114 S.Ct. 2445. The Court thus rejects the premise that the Solomon Amendment draws a distinction based on the viewpoint expressed.
It is, of course, axiomatic that the government may not regulate speech based on its substantive content or the viewpoint it conveys. Rosenberger, 515 U.S. at 828, 115 S.Ct. 2510; see also R.A.V. v. City of St. Paul, 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("The government may not regulate [speech] based on hostility â or favoritism â towards the underlying message expressed."). Plaintiffs contend that the Solomon Amendment discriminates on the basis of viewpoint because it does not apply to every academic institution, but only to those institutions that target the military in protest. The first flaw in this argument is that anti-military sentiment can and does thrive in situations where law schools decide to comply with the Solomon Amendment. The record demonstrates that law school administrators, faculty, and students have all openly expressed their disapproval of the military's discriminatory policy through various channels of communication. Some law schools have posted ameliorative statements throughout the school; law faculty and student bar resolutions have openly condemned the military's policy; and faculty and students have held demonstrations protesting the military's presence on campus. This is simply not a case where the Government is trying to "suppress, disadvantage, or impose differential burdens upon speech because of its content." Turner Broad. Sys., Inc., 512 U.S. at 642, 114 S.Ct. 2445.
The second flaw is that the Solomon Amendment is not a direct restriction on expression; the impact on law school recruiting policies is indirect. Compare Rosenberger, 515 U.S. 819, 115 S.Ct. 2510; Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (invalidating as impermissible content discrimination a law that prohibited all picketing in a residential neighborhood, except labor picketing); Boos v. Barry, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (prohibiting display of signs bringing foreign government into disrepute within 500 feet of the embassy was content-based restriction on political speech). By its terms, the Solomon Amendment does not attempt to silence a particular viewpoint thought to be inimical to the Government's interests. The statute is not concerned with the underlying motivation that may prompt an institution to deny access to military recruiters. Today, the motivation arises from a disagreement with the military's policy towards sexual orientation; tomorrow, *316 the motivation might stem from some other disagreement with the military. The point is that the Solomon Amendment continues to target the same conduct, to wit, denial of access to campus and students for military recruiting, even if the underlying viewpoint that might prompt an institution to deny such access is subject to change.[11]
Nor does the fact that the Solomon Amendment expressly excludes certain educational institutions support Plaintiffs' contention that the statute is viewpoint-based. That the statute does not apply to an institution that "has a longstanding policy of pacifism based on historical religious affiliation," 10 U.S.C. § 983(c)(2), merely comports with the long-standing principle, codified by statute, that a person "who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form" is not required to engage in military service. 50 U.S.C.App. § 456(j). It would serve no common-sense purpose to invoke the Solomon Amendment against pacifist schools where military recruiting efforts would be futile. Likewise, the statute does not apply to educational institutions where there is a lack of student interest, 32 C.F.R. § 216.4(c)(6)(ii), since military recruiting would also be futile in the absence of any such interest. And that it does not apply to institutions where "all employers are similarly excluded from recruiting on the premises of the covered school," 32 C.F.R. § 216.4(c)(3), merely reflects the DOD's reasonable view that it should not give the military employer an unfair advantage by invoking the Solomon Amendment against an institution which prohibits all employers from recruiting on campus. Thus, the exceptions carved out by the Solomon Amendment are based on pragmatic considerations, unrelated to speech, and in no way support Plaintiffs' argument that the statute discriminates on the basis of viewpoint.
Finally, Plaintiffs argue that the Solomon Amendment is viewpoint-based because it promotes one viewpoint: the Government's pro-military viewpoint. For the reasons discussed supra, the Court rejects the notion that recruiting is sufficiently communicative to make this case similar to Barnette, Wooley, and the other compelled speech cases relied on by Plaintiffs. Any expressive component to recruiting is incidental, and any threat of government compulsion to adopt a particular viewpoint is far too tenuous and insubstantial to trigger constitutional alarm. Furthermore, to the extent recruiting is expressive, "it [is] inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies." Southworth, 529 U.S. at 229, 120 S.Ct. 1346 (citing Rust, 500 U.S. 173, 111 S.Ct. 1759; Regan, 461 U.S. at 548-49, 103 S.Ct. 1997). Presumably, a government `viewpoint' is subsumed within all federal spending programs, for the spending power permits the government to promote broad policy objectives through the conditioned-receipt of federal funds. Public funds spent on recruiting for the military are no different. But a federal subsidy program does not discriminate based on viewpoint simply because it has incidental effects on First Amendment interests. See Finley, 524 U.S. at 587-88, 118 S.Ct. 2168 (noting that government may allocate competitive funding according to criteria *317 that would be impermissible were direct regulation of speech at stake); Regan, 461 U.S. at 550, 103 S.Ct. 1997 ("Where governmental provision of subsidies is not aimed at the suppression of dangerous ideas, its power to encourage actions deemed in the public interest is necessarily far broader.") (internal citations omitted).
The Solomon Amendment is not a direct regulation of speech, notwithstanding the incidental effect on First Amendment freedoms. And because it does not target speech, it draws no distinction based on the viewpoint expressed. Accordingly, Plaintiffs' have not demonstrated a likelihood of success on the merits of their viewpoint discrimination claim.

III. Void-for-Vagueness Claim
Plaintiffs argue that the Solomon Amendment and its implementing regulations are unconstitutionally vague for failing to offer clear guidance on what actions or inactions will result in a determination that law schools have "either prohibit[ed], or in effect prevent[ed]" the military from gaining "entry to campuses, or access to students," 10 U.S.C. § 983(b)(1), or have satisfied the exemption for affording the military a "degree of access ... [that] is at least equal in quality and scope to that afforded to other employers," 32 C.F.R. § 216.4. It follows, according to Plaintiffs, that military recruiters have unbridled discretion to decide what acts or omissions do not comply with the statute and which institutions are to be targeted for noncompliance. Plaintiffs further argue that it is unclear whether and to what extent an offending subelement risks funding to the entire university.
The Government responds that the conditional funding requirements imposed by the Solomon Amendment need only be set forth with a reasonable degree of certainty and, judged by that standard, the statute survives constitutional scrutiny. The Government maintains that the statute's conditional funding limitations are clear, the implementing regulations sufficiently define the scope of the statute, and that uniformity of application is ensured by a centralized decisionmaker â the United States Secretary of Defense.
There are two general standards for evaluating whether a law is unconstitutionally vague. First, a law must not "forbid[ ] or require[ ] the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning." Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). Second, the law "must provide explicit standards for those who apply" it so as to avoid arbitrary and discriminatory enforcement. Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). But those criteria are not to be "mechanically applied." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). "The degree of vagueness that the Constitution tolerates â as well as the relative importance of fair notice and fair enforcement â depends in part on the nature of the enactment." Id.
Whether a law "threatens to inhibit the exercise of constitutionally protected rights" is critical in determining the level of clarity demanded by the Constitution. Id. at 499, 102 S.Ct. 1186. "Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards." Finley, 524 U.S. at 588, 118 S.Ct. 2168. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v. Button, 371 U.S. 415, 432-33, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (citations omitted). The underlying *318 rationale is that an unclear law regulating speech might deter persons from engaging in protected speech or activity, and the very threat of sanctions could have as strong a deterrent effect on the exercise of fundamental rights as the actual application of sanctions. Id. at 433, 83 S.Ct. 328. Thus, vagueness inquiries as to laws regulating fundamental constitutional rights such as the freedoms of speech, assembly, or association, are particularly rigorous.
The corollary to that rule is that some laws are subject to a slightly less rigorous vagueness standard. Terms that are unconstitutionally vague for purposes of criminal or regulatory statutes might pass constitutional muster in other contexts. See, e.g., Finley, 524 U.S. at 588-89, 118 S.Ct. 2168 (holding "undeniably opaque" terms capable of raising significant vagueness concerns in certain contexts not unconstitutionally vague in selective subsidies context). Economic regulation, for example, is subject to a "less strict vagueness test" because it often deals with narrowly defined circumstances and because "businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." Village of Hoffman Estates, 455 U.S. at 498, 102 S.Ct. 1186.
The Solomon Amendment is not a penal statute, nor is it a direct regulation on speech. The statute conditions the receipt of federal funds on conduct â a school permitting a periodic visitor (military recruiter) who has no enduring association with the school to engage in on-campus recruiting. So viewed, the Solomon Amendment does not readily trigger a heightened vagueness standard. Cf. Finley, 524 U.S. at 599, 118 S.Ct. 2168 (Scalia, J., concurring) ("[W]hat is true of the First Amendment is also true of the constitutional rule against vague legislation: it has no application to funding. Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government regulation of expressive conduct, not government grant programs.") (internal citations omitted). On the other hand, the Solomon Amendment is not altogether devoid of First Amendment implications. The Court acknowledges that, as a practical matter, law schools needed to adjust their existing recruitment policies in order to comply with the Solomon Amendment. But, as explained supra, the statute has only an incidental effect on the law schools' First Amendment rights. The Court accordingly concludes that a slightly less rigorous vagueness standard is appropriate.
The Solomon Amendment conditions funding on a school not having "a policy or practice ... that either prohibits, or in effect prevents," military recruiters from "gaining entry to campuses" or gaining "access" to students for recruiting purposes. 10 U.S.C. § 983. Plaintiffs point to three possible interpretations of that language: (1) the schools need do no more than refrain from closing its doors to the military in order to secure funding; (2) the schools must provide some level of assistance to the military in its recruiting efforts; or (3) the schools must treat the military the same as any other employer. Plaintiffs rightly point out that the DOD regulations do not define the operative terms. See 32 C.F.R. § 216.3. But the mere absence of definitions does not necessarily render the statute vague, particularly where, as here, the terms are subject to interpretation according to their commonly understood meaning. See Horn v. Burns & Roe, 536 F.2d 251, 255 (8th Cir.1976) (noting that requirement of reasonable certainty "does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding"); see also Village of Hoffman Estates, 455 U.S. at 501, n. 18, *319 102 S.Ct. 1186 (relying in part on dictionary definition for purposes of vagueness analysis); United States v. Clinical Leasing Serv., Inc., 925 F.2d 120, 123 (5th Cir.1991) (same); House v. United States, I.R.S., 593 F.Supp. 139, 142 (W.D.Mich. 1984) (same).
The operative terms of the Solomon Amendment are not complex or difficult to understand such that one of ordinary intelligence must "necessarily guess" at their meaning. See Connally, 269 U.S. at 391, 46 S.Ct. 126. The military "gaining entry" to campuses plainly contemplates entering the campus gates. To enter something is "to go or come into" it. Webster's Third New International Dictionary 756 (2003). Access is defined as "permission, liberty, or ability to enter, approach, communicate with." Id. at 11. Thus, to comply with the Solomon Amendment, a school must allow the military to come onto campus and to communicate with interested students for purposes of recruiting. Schools that do not allow the military on campus, and thereby prohibit on-campus recruitment, do not comply with the statutory requirements. The statute is abundantly clear in that respect.
Schools that allow the military on campus, yet "in effect prevent" military recruiting efforts also do not comply with the Solomon Amendment. The phrase in effect means "virtually" or "in substance," id. at 724, and the term prevents means "to keep from happening," id. at 1798. "In effect prevents" therefore contemplates virtually keeping the military from recruiting students or posing obstacles that would normally lead to abandonment of the recruiting effort. Importantly, Congress chose not to use language connoting anything less than a total or effective prohibition on the military's recruitment efforts, such as "interfere," "hinder," "impede," or "adversely affect." It follows that anything short of preventing or totally thwarting the military's recruitment efforts does not trigger funding denial pursuant to the statute. Although it is conceivable that assistance provided to other employers (which thereby facilitates those employers' recruiting efforts) could, under certain circumstances, rise to the level of "in effect prevent[ing]" military recruitment efforts, the fact "[t]hat there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous" to pass constitutional muster. U.S. v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).
Nor is the exemption for schools that provide a "degree of access by military recruiters [that] is at least equal in quality and scope to that afforded to other employers," 32 C.F.R. § 216.4, void for vagueness. Plaintiffs challenge that exemption as "supremely subjective." The Court disagrees. The exemption is necessarily applicable to a variety of circumstances because the degree of access provided to employers will vary across schools. The benchmark for satisfying the exemption is what degree of access a given school provides to other employers and the regulation then requires a comparison with the degree of access given to the military recruiters. Such a comparison is not imbued with either vagueness or undue subjectivity. The Court is unwilling to conclude that the exemption's flexibility and broad applicability renders it impermissibly vague. See Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 339-41, 72 S.Ct. 329, 96 L.Ed. 367 (1951) ("[M]ost statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell *320 out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded.").
Lastly, the Court concludes that the consequences of non-compliance with the Solomon Amendment are sufficiently clear to pass constitutional muster. The statute denies federal funding to "an institution of higher education (including any subelement of such institution) if ... that institution (or any subelement of that institution) has a policy or practice" prohibiting military recruitment efforts. 10 U.S.C. § 983(b). Plaintiffs point out that, over time, the military has adopted three different interpretations of that language: (1) funding restrictions are limited to the offending subelement, see 61 Fed.Reg. 7739; 32 C.F.R. § 216.3(b)(1) (prior to January 3, 2003) ("In the event of a determination ... affecting only a subelement of a parent institution ..., the limitation on the use of funds ... shall apply only to the subelement and not to the parent institution as a whole."); (2) the extent of funding restrictions varies depending on the source of funds, 48 C.F.R. § 209.470.1; (3) or, as allegedly threatened by some military functionaries, all federal funds from all sources are cut off due to a subelement's non-compliance with the statute, (Chemerinsky Decl. ś 21; Gerken Decl. ś 15). Plaintiffs acknowledge, though, that current DOD regulations provide that an offending subelement risks DOD funds flowing to both the subelement and its parent university, as well as other federal funds flowing to the subelement. (Pls.' Mem. Supp. Prelim. Inj. at 10 (citing 65 Fed. Reg. 2056 (Jan. 13, 2000) and 32 C.F.R. § 216.3)). Current regulations thus define the consequences of violating the Solomon Amendment: An offending subelement, or law school, risks DOD funding earmarked for the law school and its parent institution, as well as other federal funding flowing to the law school itself (but not to the parent). In other words, the subelement limitation does not apply to DOD funds.
Plaintiffs do not allege that the DOD has made a final determination denying funding in a manner unauthorized by the statute, and there is nothing in the record to suggest that such action has been taken. The crux of Plaintiffs' claim as to the consequence of non-compliance is that military functionaries have threatened schools with a university-wide cut-off of funding that is unsupported by existing DOD regulations. In that regard, Plaintiffs contend that the military recruiters are akin to local governmental officials who exercise unbridled discretion on licensing decisions concerning demonstrations, parades, solicitation, and like activities. See, e.g., City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (ordinance giving discretion to mayor in issuing permits for newsbox placement on city sidewalks); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (ordinance requiring permit for parade); Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938) (city ordinance prohibiting distribution of leaflets or advertising without city manager's permission).
The nature of Plaintiffs' claim â that a threatened cut-off of university funding runs afoul of the implementing regulations â belies the assertion that there is no clear guidance as to funding consequences. The guidance that exists is sufficiently clear, though unwelcome. That guidance ensures against arbitrary enforcement of the statute. Furthermore, military recruiters have no express or implied authority to make final funding determinations. Only the Secretary of Defense has statutorily conferred authority to make those decisions. The concern as to arbitrary enforcement *321 is minimal given a centralized decisionmaker and, as previously discussed, the Court believes that the terms of the Solomon Amendment are sufficiently clear so as not to confer unfettered discretion in targeting institutions or making final funding determinations. Plaintiffs of course remain free to challenge a final funding determination as inconsistent with the Solomon Amendment or its implementing regulations.
The Court concludes that Plaintiffs have not established a likelihood of success on the merits on their vagueness challenge to the Solomon Amendment and its implementing regulations. That is not to say that the Court agrees with the DOD's proposed interpretation that the statute requires law schools to "provide military recruiters access to students that is at least equal in quality and scope to the access provided other potential employers." (Eskridge Decl. ś 55, Ex. 18). The Court's conclusion is in no way an endorsement of the DOD's position. The DOD's interpretation, in effect, turns the exemption in 32 C.F.R. § 216.4 into a statutory requirement, and the Court has grave reservations as to whether such an interpretation is sustainable as a matter of statutory construction.
It is axiomatic that the DOD is not at liberty to adopt an interpretation contrary to the plain wording of the Solomon Amendment. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("[T]he court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."). By letter dated May 29, 2003, Acting Deputy Under-Secretary of Defense William Carr stated that the DOD interpreted 10 U.S.C. § 983(b)(1) to require that there not "be a substantial disparity in the treatment of military recruiters as compared to other potential employers" and that the statute "should, and will, be construed to require equal access for military recruiters â the construction that better permits the military to fulfill congressional intent." That interpretation of the Solomon Amendment is problematic for several reasons. Insisting on "equal access" and demanding that there be no "substantial disparity" are not the same thing. No substantial disparity allows for something less than equal access. More importantly, the statute could easily have provided that military recruiters are to be treated the same as other employers. The statute does not so provide. While it is conceivable (in presently unknown circumstances) that a substantial disparity between treatment of the military and other employers could rise to the level of "in effect prevent[ing]" military recruitment efforts, the Court simply fails to see how the statute requires absolute parity when all that it requires is that a school not "prohibit" or "in effect prevent" military recruiting efforts. Finally, reading the "equal in quality and scope" aspect into the substantive statutory requirements swallows the exemption for schools allowing a "degree of access by military recruiters [that] is at least equal in quality and scope to that afforded to other employers," 32 C.F.R. § 216.4. That exemption applies to schools that do not comply with the requirements of the statute.
The Court concludes that Plaintiffs have not established a likelihood of success on their void-for-vagueness claim, notwithstanding the DOD's seemingly unwarranted interpretation that the Solomon Amendment requires law schools to treat the military the same as other employers.

*322 IV. Remaining Factors for Preliminary Injunction
Having concluded that Plaintiffs have not established a likelihood of success on the merits of their constitutional challenges to the Solomon Amendment and its implementing regulations, the Court need not decide whether Plaintiffs have satisfied the remaining requirements for preliminary injunctive relief. That is because "`a failure to show a likelihood of success ... must necessarily result in the denial of a preliminary injunction.'" Morton v. Beyer, 822 F.2d 364, 371 (3d Cir.1987) (quoting In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir.1982)). For the sake of completeness, though, the Court will address the three remaining factors for preliminary injunctive relief â irreparable harm, balance of hardships, and public interest. Tenafly Eruv Ass'n, Inc., 309 F.3d at 157. As will be seen, evaluation of those factors is interrelated with the Court's evaluation of the likelihood-of-success factor.
The loss of First Amendment freedoms constitutes irreparable harm. Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). "[T]he irreparable injury issue and likelihood of success issue overlap almost entirely" where First Amendment violations are concerned. Beal v. Stern, 184 F.3d 117, 123 (2d Cir.1999). Given this Court's conclusion that Plaintiffs have not established a likelihood of success on the merits of their First Amendment claims, there is no risk of irreparable harm absent a preliminary injunction.
The balance-of-hardships and the public interest factors also weigh in favor of the Government. That an Act of Congress is presumptively constitutional is "an equity to be considered in favor of applicants in balancing hardships." Walters v. National Ass'n of Radiation Survivors, 468 U.S. 1323, 1324, 105 S.Ct. 11, 82 L.Ed.2d 908 (1984) (Rehnquist, Circuit Justice) (granting request for stay of injunction enjoining enforcement of statute on constitutional grounds). The Solomon Amendment is presumptively constitutional. Given this Court's conclusion that Plaintiffs have not established a likelihood of success on the merits of their constitutional claims, the harm to the Government in being precluded from enforcing the Solomon Amendment and engaging in on-campus recruiting outweighs the harm that would result to Plaintiffs by denying them preliminary injunctive relief. Moreover, Congress has imposed on the military an obligation to "conduct intensive recruiting campaigns to obtain enlistments" in the branches of the armed forces. 10 U.S.C. § 503(a). And "Congress considers access to [institutions of higher education] by military recruiters to be a matter of paramount importance" and an "integral part" of military recruiting efforts. United States v. City of Philadelphia, 798 F.2d at 86. The Solomon Amendment furthers those interests. Enforcing the First Amendment is indisputably a matter of great public interest, but where, as here, the Court has not found a likelihood of success on the First Amendment claims, the public interest factor weighs in favor of the Government.

V. Conclusion
For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction enjoining enforcement of the Solomon Amendment as unconstitutional will be denied.
NOTES
[1] Plaintiffs have not directly challenged 10 U.S.C. § 983(b)(2).
[2] Legislative history indicates that the Solomon Amendment sought to "not give taxpayer dollars to institutions ... interfering with the Federal Government's constitutionally mandated function of raising a military" and to encourage recruitment of "the most highly qualified candidates from around the country." 141 Cong. Rec. E13-01 (Jan. 4, 1995). Representative Solomon introduced the law as an effort to

tell[] recipients of Federal money at colleges and universities that if you do not like the Armed Forces, if you do not like its policies, that is fine. That is your first-amendment rights. But do not expect Federal Dollars to support your interference with our military recruiters.
140 Cong. Rec. H3861 (1994). Representative Pombo, a co-sponsor, similarly noted "[a] growing, and misguided, sense of moral superiority ... creeping into the policies of colleges and universities in this country." Id. at H3863. He urged that those institutions
need to know that their starry-eyed idealism comes with a price. If they are too good â or too righteous â to treat our Nation's military with the respect it deserves ... â then they may also be too good to receive the generous level of taxpayer dollars presently enjoyed by many institutions of higher education in America.
Id. He ended by encouraging his "colleagues to support the Solomon Amendment, and send a message over the wall of the ivory tower of higher education." Id.
Legislative history also indicates that the DOD did not support passage of the Solomon Amendment. See 140 Cong. Rec. H3860-03 (1994) (Reps.Underwood, Harman, Schroeder). To the contrary, the DOD opposed it as "unnecessary, duplicative, and potentially harmful to defense research initiatives." Id. at H3863 (Rep.Underwood).
[3] The military's prohibition against homosexual conduct is codified at 10 U.S.C. § 654. The policy provides for the separation of a member of the armed forces upon a finding:

(1) That the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are further findings, made and approved in accordance with procedures set forth in such regulations, that the member has demonstrated that â 
(A) such conduct is a departure from the member's usual and customary behavior;
(B) such conduct, under all the circumstances, is unlikely to recur;
(C) such conduct was not accomplished by use of force, coercion, or intimidation;
(D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and
(E) the member does not have a propensity or intent to engage in homosexual acts.
(2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.
(3) That the member has married or attempted to marry a person known to be of the same biological sex.
10 U.S.C. § 654.
[4] Yale Law School and USC Law are mentioned for illustrative purposes only. Neither institution is a party to this action.
[5] The brief in support of the Government's Motion to Dismiss Plaintiffs' Second Amended Complaint For Lack of Standing incorporates by reference the arguments made in the Government's original Motion to Dismiss. The Court will address the arguments advanced in both submissions.
[6] To assist the Court in evaluating FAIR's standing, Plaintiffs submitted the FAIR membership list for in camera review.
[7] The Court does not reach the issue of whether First Amendment rights of association will protect FAIR from revealing its membership list later in this litigation. See, e.g., Brown v. Socialist Workers '74 Campaign Comm., 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).
[8] For purposes of Plaintiffs' as-applied First Amendment challenge, the Court accepts the DOD's proposed interpretation of the Solomon Amendment, i.e., requiring the affirmative assistance of the law schools. However, as a matter of statutory construction, the Court has serious reservations as to the DOD's interpretation. See discussion infra in Section III.
[9] The Court notes that if the Solomon Amendment's effect on law school recruiting policies were independently evaluated under a traditional free speech analysis, and not within the Dale analytical framework, the O'Brien test would still apply, as the effect on these policies is incidental.
[10] Plaintiffs' facial challenge to the Solomon Amendment alleges that the restriction of law schools' associational freedoms results from the mere presence of military recruiters on campuses. But if Plaintiffs define the restriction as the presence of military recruiters on campuses, it is obvious that any means less restrictive of law schools' associational rights would entirely frustrate the governmental objective, which is to gain access to campuses for the purpose of military recruiting. That is, it is wrong to claim that the Government could achieve its objective in a less burdensome manner by abandoning that very objective.
[11] The Court does not share Plaintiffs' view that the DOD's current posture is predominantly an effort to suppress the law schools' messages of non-discrimination. Plaintiffs' arguments to the contrary are not convincing since they are unsupported by factual evidence which goes directly to any improper motivation. The evidence supplied suggests that the DOD is attempting to enforce the law as they currently construe it.